**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------x
GREAT LAKES INSURANCE SE          :     CIVIL ACTION NO.
IN ITS OWN RIGHT AND/OR AS        :
SUBROGEE OF PACIFIC GULF          :
SHIPPING CO.,                     :
                      Plaintiff,  :
                                  :
        v.                        :     IN ADMIRALTY
                                  :
AMERICAN STEAMSHIP OWNERS         :
MUTUAL PROTECTION AND             :
INDEMNITY ASSOCIATION INC.        :
A/K/A THE AMERICAN CLUB,          :
SHIPOWNERS CLAIMS BUREAU INC.,    :
GEORGE GOURDOMICHALIS, AND        :
EFSTATHIOS GOURDOMICHALIS,        :
                                  :
                      Defendants. :
-------------------------------------------------------x
```

## COMPLAINT

**COMES NOW**, Plaintiff Great Lakes Insurance SE (hereinafter "GREAT LAKES" or "Plaintiff") in its own right and/or as subrogee of PACIFIC GULF SHIPPING CO., by and through the undersigned counsel, for its Complaint against Defendants AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION INC. a/k/a THE AMERICAN CLUB, SHIPOWNERS CLAIMS BUREAU INC., GEORGE GOURDOMICHALIS, and EFSTATHIOS GOURDOMICHALIS (hereinafter collectively "Defendants") and alleges upon information and belief as follows:

## INTRODUCTION

1.      Defendants conspired, confederated, and/or agreed to purposefully abandon the M/V ADAMASTOS ("the Vessel") in Brazil in January 2015. The Vessel was unseaworthy and was facing tens of millions of dollars in claims, all while fully loaded with a cargo of soyabeans,

1

at the time that Defendants walked away from the Vessel.

2.      The wrongful abandonment of the Vessel was orchestrated by Defendants for their own self-serving purposes in order to avoid all contractual and/or legal liabilities associated with the Vessel's port call in Brazil and breach their obligations to the Vessel's contractual partners, cargo interests, and crew.

3.      As more fully set forth below, the Defendants' misconduct has caused Plaintiff GREAT LAKES to incur considerable damages, losses, and costs.

## JURISDICTION, VENUE, AND PARTIES

4.      Subject matter jurisdiction of this Honorable Court is based upon admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, as hereinafter more fully appears, and involves an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

5.      Plaintiff GREAT LAKES is a foreign company organized under the laws of Germany.  GREAT LAKES was formerly a foreign company domiciled in the United Kingdom and was known as Great Lakes Reinsurance (UK) PLC which then became known as Great Lakes Reinsurance (UK) SE.  At all material times, GREAT LAKES was and still is a wholly owned subsidiary of the Munich Re Group.  On or about January 8, 2017, Great Lakes Reinsurance (UK) SE. was redomiciled to Germany as Great Lakes Insurance SE with an office and principal place of business in Munich, Germany.   GREAT LAKES was and still is a citizen of Germany and is registered and authorized to conduct business in London, United Kingdom.  All rights and liabilities of Great Lakes Reinsurance (UK) SE were assumed by GREAT LAKES.

6.      At all times material hereto, The American Steamship Owners Mutual Protection and Indemnity Association, Inc. a/k/a The American Club ("The American Club") was and is a

mutual provider of protection and indemnity insurance, which covers vessel owners and charterers against third-party liabilities arising from the ownership and operation of insured vessels. The American Club issues to each of its "members" a Certificate of Entry, which reflects that the member has entered into a marine insurance contract with The American Club.

7.     The American Club is an insurance company duly qualified pursuant to the laws of the State of New York and doing business in this jurisdiction through its authorized representative located in New York, New York.

8.     At all material times hereto, Shipowners Claims Bureau Inc. ("SCB") was incorporated under the laws of the State of New York and doing business in this jurisdiction.

9.     At all material times, SCB managed Defendant The American Club.

10.    At all times material hereto, George Gourdomichalis was and is a foreign citizen with a principal residence in Athens, Greece and who regularly travels to and conducts business in New York, including but not limited to serving as a member of the Board of Directors for The American Club, and serving as the Chairman of the Board.

11.    At all times material hereto, Efstathios "Stathis" Gourdomichalis was and is a foreign citizen with a principal residence in Athens, Greece who regularly travels to and conducts business in New York.

12.    Venue is proper in this District as The American Club and SCB have a principal executive office and place of business located at 1 Battery Park Plaza, 31st Floor, New York, New York, 10004.

## FACTS

### A.     Plaintiff's Background and Covered Interests

13.    GREAT LAKES is a German insurance company regulated by Bundesanstalt für Finanzdienstleistungsaufsicht, the Federal Financial Supervisory Authority of Germany and acts as

a specialist provider of insurance services and a preferred facilitator of insurance business.  It has offices in Germany, the United Kingdom, Switzerland, Italy, and Australia.

14.     One of the insurance products which GREAT LAKES provides is a specialized marine insurance policy for charterers which provides policyholders with liability protection for, among other things, liability for loss of/damage to the chartered vessel, liability for loss of/damage to the cargo being carried, and other general liability risks associated with the operation and carriage of cargo which might arise.

15.     In the maritime industry, this specialized marine insurance for liability is commonly known as Protection & Indemnity Coverage, or "P&I insurance."

16.     At all material times, GREAT LAKES authorized Michael Else & Company Ltd. ("MECO") to issue these specialized marine liability insurance policies on its behalf by and through MECO's insurance brand, The Charterers P&I Club ("Charterers Club").

17.     MECO serves as the managing agent for GREAT LAKES and issued P&I insurance policies through the Charterers Club pursuant to a binding agreement by and between MECO and GREAT LAKES.

18.     Pacific Gulf Shipping Co. ("Pacific Gulf") is a Marshall Islands company which at all material times was in the business of chartering vessels in the dry bulk sector for the transportation of goods, materials, and cargo worldwide.

19.     On or about November 12, 2013, Pacific Gulf obtained liability P&I insurance from the Charterers Club, all of which is reflected in a Certificate of Insurance with reference: CC2013 272/1.  A copy is attached hereto as Exhibit 1.

20.     In addition to liability coverage of up to $50,000,000 for any one accident or occurrence, the Certificate of Insurance also covered defense costs, fees, and expenses up to

4

$1,000,000 for any one accident or occurrence. *Id*.

21.    The M/V ADAMASTOS (*i.e.* the Vessel at the heart of this controversy) was added by Pacific Gulf as a "covered vessel" pursuant to its Certificate of Insurance issued by MECO through the Charterers Club brand. See Exhibit 2.

22.    Maritime insurance, including P&I insurance is a traditional maritime activity and a maritime contract.

23.    Intergis Co., Ltd. (Intergis) is a Korean company which at all material times was and is in the business of chartering and operating vessels in the dry bulk sector for the transportation of goods, materials, and cargo worldwide.

24.    On or about August 28, 2013, Intergis was issued liability P&I insurance by Charterers Club, all of which is reflected in a Certificate of Insurance with reference: CC2013 221/1. A copy is attached hereto as Exhibit 3.

25.    In addition to liability coverage of up to $50,000,000 for any one accident or occurrence, the Certificate of Insurance also covered defense costs, fees, and expenses up to $2,000,000 for any one accident or occurrence. *Id*.

**B.    Defendants' Background and the Vessel**

26.     The American Club also provides P&I insurance to cover, *inter alia*, shipowners, operators, and charterers for third-party liabilities encountered in the commercial operation of entered vessels, including but not limited to, claims for cargo loss, shortage, or damage, collision, pollution, crew repatriation and substitution, loss of life, injury and illness of crew, passengers and other persons, and various other covered liabilities.

27.    The American Club refers to this liability cover as "Class I" and the Class I Rules are, together with the Certificate of Entry, the basic contractual terms upon which the

owners/operators, or "members," are insured by The American Club.

28.     Pursuant to The American Club's Rules, members are directed to follow "basic duties and obligations" when a claim arises.  These include, but are not limited to:

   a. Promptly notifying The American Club of any new incidents for which it is insured.

   b. Refraining from instructing any lawyers, surveyors, or other consultants without first consulting with and obtaining The American Club's written consent for any such retention.

   c. Following The American Club's lead on handling of any claim.  As set forth in The American Club's own materials, "The Member's interests are best handled by the Club and its assigned Correspondents who possess the proper knowledge, experience and expertise to handle claims efficiently and effectively."

29.     The M/V ADAMASTOS (hereinafter "the Vessel") was a 39,017 gross ton dry bulk vessel built in 1995 and registered in Liberia.

30.     The Vessel's registered owner was the brass-plate company Adamastos Shipping & Trading, S.A. ("Adamastos Shipping"), which had a registered address at 80 Broad Street, Monrovia, Liberia.

31.     However, at all material times, the Vessel and Adamastos Shipping were beneficially owned and operated by Defendants George Gourdomichalis and Stathis Gourdomichalis.

32.     Defendants George Gourdomichalis and Stathis Gourdomichalis have a long history of unsuccessful ship-owning interests which have previously failed and left various creditors and contractual partners with significant losses and damages.

33.     In 2011, Defendants George Gourdomichalis and Stathis Gourdomichalis incorporated Phoenix Shipping & Trading, S.A. (hereinafter "Phoenix Shipping") in the Marshall Islands and set up its principal place of business at 25 Akti Miaouli Street, Piraeus Greece. Phoenix

Shipping was at all material times completely owned and operated by Defendants George Gourdomichalis and Stathis Gourdomichalis.

34.     Phoenix Shipping was founded in order to create a new business for George Gourdomichalis and Stathis Gourdomichalis following the  failure of their previous shipping companies, including but not limited to Gourdomichalis Naftiki  Eteria, Free  Bulkers, and G. Bros  Maritime  S.A.[1]

35.     Like a phoenix rising from the ashes for the benefit of George Gourdomichalis and to the detriment of everyone else, Phoenix Shipping was created as a follow-up ship operator to the previously failed companies owned and operated by George Gourdomichalis and Stathis Gourdomichalis.

36.     George Gourdomichalis was and is the President and Chief Executive Officer of Phoenix Shipping.  Stathis Gourdomichalis was and is the Secretary/Treasurer and the Chief Operating Officer of Phoenix Shipping.

37.     The M/V ADAMASTOS was acquired in 2012 by Defendants George Gourdomichalis and Stathis Gourdomichalis by and through a brass plate company Adamastos Shipping.  The sole signatory on the 2012 first preferred mortgage for the Vessel was George Gourdomichalis.

38.     Pursuant to an agreement dated December 7, 2012, Phoenix Shipping was the technical and commercial manager for the Vessel and required to run all aspects of the M/V ADAMASTOS and Adamastos Shipping's business, including all chartering operations, crew management, technical management, commercial management, insurance arrangements, and

---

[1] Phoenix Shipping was nothing more than a continuation of the previously failed businesses by Defendants George Gourdomichalis and Stathis Gourdomichalis.  It represented a  new name, but was the same basic business operated from the same location on the Akti Miaoli in Piraeus Greece with the same employees and individuals in the company.

accounting services for the Vessel.

39.     Phoenix Shipping was also the "operator" of the Vessel.  A vessel "operator" is an entity "who is responsible for the operation, manning, victualing, and supplying of the vessel." 33 U.S.C. § 1901(9).

40.     George Gourdomichalis negotiated and signed the ship management agreement on behalf of Adamastos Shipping contemporaneously with his service as the person in charge of all commercial operations and chartering for Phoenix Shipping.

41.     The Vessel had a fair market value of no more than $6,000,000.

42.     Notwithstanding, the Vessel was mortgaged for four (4) times its value, *i.e.* $24,000,000.

43.     No capital and/or other consideration was required for the purchase of the Vessel.

44.     The Gourdomichalis brothers acquired the Vessel through a complex, veiled financing scheme in order to permit Defendants George Gourdomichalis and Stathis Gourdomichalis to take possession and ownership of a vessel without risk.

45.     During the time that the Vessel was beneficially owned and operated by George Gourdomichalis and Stathis Gourdomichalis, not a single payment was made on the preferred ship mortgage.

46.     Phoenix Shipping, by, through, and/or at the request of, and/or for and on behalf of George Gourdomichalis and Stathis Gourdomichalis made all decisions concerning the commercial operation, technical operation, management, crewing, chartering, and the placement and procurement of the insurance coverage for the M/V ADAMASTOS.

47.     In addition, George Gourdomichalis and Stathis Gourdomichalis performed all banking operations, financial recordkeeping, and maintained all accounts for and on behalf of the

Vessel.

48.     Despite the fact that the M/V ADAMASTOS was encumbered with a preferred ship mortgage four (4) times above the value of the asset and the fact that Adamastos Shipping had no physical address, no employees of its own, and no value or capital, The American Club provided P&I insurance coverage to the Vessel and her Owning, Operating, and Managing interests.

49.     The insurance policy was provided to the M/V ADAMASTOS because George Gourdomichalis was a member of The American Club Board of Directors.

50.     No further inquiry as to viability of Adamastos Shipping and/or the true condition of the Vessel was considered and/or completed by The American Club.

51.     The American Club issued a Certificate of Entry for Class I – Protection & Indemnity Insurance for the M/V ADAMASTOS for the period of February 20, 2014 – February 20, 2015. A copy is attached at Exhibit 4.

52.     Adamastos Shipping was named as the member and Phoenix Shipping was listed as the co-assured on the Certificate of Entry.

53.     The American Club also issued a Certificate of Entry for Class II – Freight, Demurrage & Defense ("FD&D")[2] Insurance for the M/V ADAMASTOS for the period of February 20, 2014 – February 20, 2015.  A copy is attached as Exhibit 5.

54.     At all material times, Phoenix Shipping was referred to by The American Club as the "Business Group" for the M/V ADAMASTOS and the member Adamastos Shipping.

55.     At all material times, George Gourdomichalis was a member of the Board of Directors of The American Club.

---

[2] FD&D insurance provides members with cover for claims handling assistance and legal costs in relation to disputes which are outside of the scope of P&I or Hull & Machinery insurance.

56. Upon information and belief, George Gourdomichalis has been a member of the Board of Directors for The American Club since at least 2010, first as the owner and CEO of G. Bros Maritime and since 2012 in his role as owner, President, and CEO of Phoenix Shipping.

57. On or about June 21, 2018, George Gourdomichalis was elected as the Chairman of the Board of Directors of The American Club, a role which he currently retains.

## C. The Charter Party Between Adamastos Shipping and Pacific Gulf

58. On or about April 8, 2014, Pacific Gulf entered into a charter party agreement with Adamastos Shipping for use of the M/V ADAMASTOS for a period between ninety (90) days and one hundred and eighty (180) days.

59. The charter agreement between Adamastos Shipping as Owners and Pacific Gulf as Charterers, set forth specific terms, rights, and obligations between the parties including the obligation to have P&I coverage on the Vessel.

60. The April 8, 2014 charter party agreement is a maritime contract.

61. Pursuant to the terms of the charter party, Pacific Gulf was to pay USD 9,000 per day including overtime payable ten (10) days in advance plus USD 130,000 gross ballast bonus to Adamastos Shipping, payable every fifteen (15) days in advance and in exchange for the use of a seaworthy vessel.

62. Pacific Gulf complied with all obligations under the terms of the charter party agreement and paid $1,114,365 in charter hire during the course of the charter party agreement.

## D. The Sub-Charter between Pacific Gulf and Intergis

63. On or about July 14, 2014, Pacific Gulf as disponent owners of the Vessel, entered into a sub-charter party agreement with Integris Co Ltd. for a one (1) time charter trip of one (1) laden leg *via* Brazil to Singapore-Japan range carrying lawful/harmless grain products in bulk.

64.     The M/V ADAMASTOS was added by Intergis as a "covered vessel" pursuant to its Certificate of Insurance issued by MECO through the Charterers Club brand.

65.     Integris Co Ltd. then sub-chartered the Vessel to Marubeni Corporation who arranged for the transportation of a soyabean cargo to be carried by the Vessel.

**E.      The Incident at Brazil and Abandonment of the Vessel**

66.     The Vessel arrived at Sao Francisco Do Sul, Rio Grande on or about July 31, 2014 and commenced loading the cargo of soyabeans starting at 0120 hours LT on August 1, 2014.

67.     On or about August 5, 2014, the Vessel was inspected by local Port State Control authorities in Brazil, who discovered no fewer than forty-two (42)  deficiencies with the Vessel.

68.     The Port State Control authorities detained the Vessel pending further investigation and rectification of the deficiencies.

69.     At or about 1855 hours LT on August 6, 2014, and while still loading cargo, the Vessel broke free of her moorings, drifted to the middle of the channel, and grounded.

70.     The Vessel had approximately 59,674.680 metric tons of soyabeans onboard as of August 6, 2014, at or about the time that she broke free of her moorings and grounded.

71.     The Vessel commenced refloating operations with her own engines and thereafter with the assistance of tugs and pilots, as well as by Salvors, Rebocadores do Brasil SA, and was refloated on August 7, 2014.

72.     Subsequently, the Vessel was shifted to the inner anchorage north of  the terminal.

73.     After the grounding, the terminal would not permit the Vessel to re-berth alongside to load the remaining cargo without meeting various conditions, including but not limited to the posting of a security bond.

74.     On or about August 12, 2014, The American Club was expressly notified by its

member, Adamastos Shipping, by and through George Gourdomichalis of the grounding incident

in Brazil and the potential claim for which Adamastos Shipping had both P&I Insurance coverage

and FD&D Insurance coverage.

75.    Specifically, George Gourdomichalis contacted The American Club's current Chief

Commercial Officer, Dorothea Ioannou[3] to notify The American Club of the incident and to seek

advice concerning the potential declaration of General Average.[4]

76.    As the incident occurred in Brazil, The American Club transferred the matter to the

New York office of The American Club which handles matters and claims which occur in North

and South America.

77.    The American Club opened **both** FD&D and P&I claims files.

78.    The deductible for the P&I Claim file was only $11,000.

79.    On or about September 10, 2014, Donald Moore,[5] the Global Claims Director for

The American Club acknowledged in an internal email within The American Club that the

costs/expenses to refloat the Vessel had cost approximately $1,000,000 (despite initially believing

that the cost was $200,000), that there was a cargo onboard valued at no less than $18,000,000,

and a Vessel which was valued at $8,7500,000.

80.    The American Club acknowledged that the incident was of "great concern" due to

---

[3] At the time, Ms. Ioannou held a lower role within The American Club, but subsequently has been promoted.

[4] "General average contribution is defined to be a contribution by all the parties in a sea adventure to make good the loss sustained by one of their number on account of sacrifices voluntarily made of part of the ship or cargo to save the residue and the lives of those on board from an impending peril, or for extraordinary expenses necessarily incurred by one or more of the parties for the general benefit of all the interests embarked in the enterprise." *STAR OF HOPE*, 76 U.S. 203, 228, 19 L.Ed. 638 (1869).

[5] At the time, Mr. Moore held the position of Senior Vice President – Claims Manager within Defendant's organization.  He was subsequently promoted to Global Claims Director.

its exposure as a "potentially large uncollectible GA claim, a potential cargo claim (and no doubt a coverage battle) caused by the Member's long delay in effecting proper repairs of the port state deficiencies), but also for the condition of the vessel in general."

81.     Adamastos Shipping, Phoenix Shipping, George Gourdomichalis, Stathis Gourdomichalis and/or The American Club (and/or others acting at their instruction and control) failed, neglected, and otherwise refused to comply with the terminal requirements and the Port Captain ordered the Vessel to shift to the outer anchorage, given the Vessel's draft and the Port State Control deficiencies and detention imposed on the Vessel.

82.     Over the course of the next six (6) months, the Vessel remained under detention, failed to load the remainder of the cargo, and failed to complete the voyage as required under the various charter party obligations.

83.     Adamastos Shipping, Phoenix Shipping, George Gourdomichalis, and Stathis Gourdomichalis unconscionably abandoned the Vessel, her crew, and her cargo, rather than honor their respective obligations to the Vessel's contractual partners, the cargo, and the crewmembers.

84.     Similarly, The American Club abandoned its obligations as insurer of the Vessel and abandoned the Vessel and its obligation to cover the covered claim(s).

85.     During this period, numerous claims and causes of actions were commenced against the Vessel by various third parties in Brazil, including (but not limited to) the following:

   a.   $1,078,512 action by the Salvors for unpaid fees and costs;

   b.   $160,000 action by Sagres Agenciamentos Maritimos Ltda. for unpaid agency fees;

   c.   $8,250 action by Kronos Maritime Agent Limited for unpaid agency fees;

   d.   An action by the Labour Prosecutor's Office which fined the Vessel

$19,000 per day from the period of November 26, 2014 – December 30, 2014.  As of December 31, 2014, the LPO action fine was increased to $150,000 per day for non- compliance through January 18, 2015, which was subsequently increased to $187,000 per day;

e.  On or about December 14, 2014, the Federal Government of Brazil commenced an action directing the Vessel and her owners to make the necessary repairs to the Vessel and deliver the cargo to its final destination;

f.  On or about January 3, 2015 the Master and crew of the Vessel commenced an action to recover their wages which had not been paid while working on the Vessel.

86.     On or about December 24, 2014, The American Club stated in an email to George Gourdomichalis that it was at all material times under the impression and belief that the M/V ADAMASTOS was beneficially owned by a closely held entity which was related to and/or owned by the management company Phoenix Shipping, to wit that Adamastos Shipping was a company owned by and on behalf of George Gourdomichalis and Stathis Gourdomichalis either directly or indirectly through other holding companies.

87.     Despite being the operator, as well as the technical and commercial manager for the Vessel, Phoenix Shipping did not seek repair estimates for the M/V ADAMASTOS, did not provide budget proposals for repair work, and did not send any written demands for payment to Adamastos Shipping for any of the items which needed to be rectified and the claims which needed to be settled in Brazil.

88.     The claims which accrued as a result of the grounding in Brazil and the failure, neglect, and/or refusal by Defendants to return the Vessel to service so that she could complete the voyage, including but not limited to the impending cargo claim for the loss of over 59,000 metric tons of soyabeans were covered claims under the applicable P&I insurance policies issued by The American Club and the Charterers Club.

89.     On January 7, 2015, Phoenix Shipping purportedly submitted a letter to the Greek government, asserting that Phoenix Shipping had ceased operation of the M/V ADAMASTOS. The letter was silent on its technical and/or commercial management obligation(s) and/or insurance coverages.

90.     No contemporaneous written notice of the termination of management services was ever provided from Phoenix Shipping to Adamastos Shipping.

91.     Immediately thereafter, Phoenix Shipping, at the direction of George Gourdomichalis and/or Stathis Gourdomichalis provided notice through an email from Phoenix Shipping to The American Club that the management services contracted by their closely held owning company had been unilaterally terminated by Phoenix Shipping.

92.     On January 8, 2015, The American Club provided notice to Adamastos Shipping and the Vessel, that P&I and FD&D Coverage for the Vessel had been terminated stating: "WITH EFFECT FROM JANUARY 8, 2015, COVER HEREUNDER IS TERMINATED BY REASON OF CHANGE OF MANAGEMENT." *See* Endorsements attached as Exhibit 6.

93.     Subsequently, The American Club processed a *pro-rata* refund of the paid premium for the unused forty-three (43) days of coverage which had been terminated as a result of Phoenix Shipping ceasing its operation/management of the Vessel. A copy is attached hereto as Exhibit 7.

94.     At the time that coverage for the M/V ADAMASTOS was purportedly terminated by The American Club, there were certain costs, fees, and expenses which had been fronted by The American Club and which were purportedly due and owing from the member (but never paid).

95.     At no time did The American Club and/or its Chairman George Gourdomichalis

take steps to recover unpaid amounts due and/owing from Adamastos Shipping and/or otherwise seek to enforce any contractual and/or lien rights held by The American Club.

96.     Even though SCB and The American Club accused George Gourdomichalis and Phoenix Shipping of misrepresenting the ownership interests of the M/V ADAMASTOS at the time that P&I insurance cover was applied for, at no time did The American Club require George Gourdomichalis (and/or his holdings), Stathis Gourdomichalis, Adamastos Shipping, and/or Phoenix Shipping accountable and/or responsible to repay the amounts paid by The American Club to surveyors, experts, and other representatives who responded to the Vessel incident and investigation.

97.     SCB and The American Club did not request or require George Gourdomichalis and/or Phoenix Shipping to give up their seat on the Board of Directors as a result of the M/V ADAMASTOS; instead The American Club made George Gourdomichalis the Chairman of the Board.

98.     Rather than take any steps to enforce The American Club's rights under the Certificate of Entry, Club Rules, and By-Laws, The American Club, SCB, George Gourdomichalis, and Stathis Gourdomichalis confederated, conspired, and/or agreed to develop an exit strategy which centered on the abandonment of the M/V ADAMASTOS by her owners and insurers in Brazil to avoid paying a large uncollectable GA claim and/or a large cargo claim.

99.     On February 12, 2015, the M/V ADAMASTOS was declared abandoned by Brazilian authorities.

100.    Ultimately, the Vessel and its damaged cargo was sold to third-party salvors who transported the M/V ADAMASTOS to Spain and sold the abandoned soyabean cargo for animal feed at a significant loss from its original value.

**F.**    **The Subsequent Litigation by Cargo Interests**

101.    In early 2015, Marubeni Corporation commenced arbitration in London against its contractual partner Intergis seeking to recover damages and losses associated with the loss of the soyabean cargo and claimed damages of no less than $32,650,000, i.e. the "Cargo Claim."

102.    On a parallel track, Intergis commenced arbitration proceedings in London against Pacific Gulf and sought recovery up-the-chain for the damages and losses caused by the Vessel's failure to complete the voyage as contracted for by Marubeni Corporation.

103.    The Cargo Claim is a classic claim covered by P&I Insurance for which there was no *bona fide* defense as to liability.  Pursuant to English law, the liability for the claim would pass from Intergris to Pacific Gulf to Adamastos Shipping.

104.    On or about June 6, 2016, Pacific Gulf pursued its contract claims in London arbitration against Adamastos Shipping for breach of the charter party agreement on the grounds that, *inter alia*, the Vessel was unseaworthy and not fit for its intended service and Adamastos Shipping had breached its obligations and responsibilities under the charter party agreement. The arbitration further sought indemnity for all claims Pacific Gulf was facing from Intergis.

105.    On April 19, 2017, the Sole Arbitrator issued a final award against Adamastos Shipping and declared that Pacific Gulf was entitled to be indemnified by Adamastos Shipping for ***any and all*** liabilities that Pacific Gulf "ha[s] or might be found to have in the  near future" related to the claims up the charter chain by Marubeni Corporation and Integris, plus applicable costs, fees, and interest.

106.    After significant negotiation, Marubeni's Cargo Claim was settled by Intergis in exchange for payment of $18,000,000 on or about May 23, 2018.

107.    The settlement amount was paid and satisfied by Plaintiff GREAT LAKES, through

MECO on May 25, 2018.  The payment was sent from MECO on behalf of Intergis to Marubeni's London Solicitors, Messrs. Roose & Partners.

108.    On March 13, 2019, the Cargo Claim by and between Intergis and Pacific Gulf was settled for $18,000,000, plus $500,000 for costs (i.e. - $18.5 million in the aggregate).

109.    As GREAT LAKES was the underwriter for both Intergis and Pacific Gulf through Certificates of Insurance issued by its managing agent MECO through the Charterers Club, there was no requirement for a payment from Pacific Gulf to Intergis.

110.    MECO adjusted the Pacific Gulf and Intergis claim files to reflect the fact that Intergis has been fully reimbursed for the $18,500,000 and that Pacific Gulf holds the loss on its own Liability File with the Charterers' Club.

111.    Although the loss arising from the Cargo Claim belonged in the first instance to Pacific Gulf, since this was a fully covered liability claim and Plaintiff GREAT LAKES paid the settlement sum to resolve Marbeni's Cargo Claim, Plaintiff in its own right and/or as subrogee of Pacific Gulf is entitled to recover damages, costs, and interest as a result of the Defendants' tortious actions.

**G.    <u>The Windfall in Favor of Defendants</u>**

112.    The Defendants have neglected, refused, and/or failed to pay the amounts due and owing under the First Final Award.

113.    Instead, Defendants have continued to operate with impunity, despite unconscionably abandoning the Vessel, its contractual partners, and its cargo in Brazil and leaving nearly $20 million of covered claims unpaid to the detriment of others but to the benefit of Defendants.

114.    The American Club is a member of the International Group. The International

Group constitutes thirteen (13) P&I Clubs, including The American Club, which provide marine liability cover (protection and indemnity) for approximately 90% of the world's ocean-going tonnage.

115.    For owned entries, the first $10,000,000 of a single vessel claim is retained and covered by the individual club.

116.    For amounts between $10,000,000 - $50,000,000, the claim is shared among the other clubs within the International Group.

117.    As of September 2014, the value of the cargo onboard the M/V ADAMASTOS was known to be no less than $18,000,000.  By late 2014/January 2015, the Cargo Claim from Marubeni was known to be exceptionally large (*i.e.* nearly $33,000,000) and three times (3x) above the individual retention amount for The American Club.

118.    As the Cargo Claim arose directly from the unseaworthy nature of the Vessel, which at all times was the responsibility of Adamastos Shipping, Phoenix Shipping, George Gourdomichalis, Stathis Gourdomichalis and The American Club, there was no defense to the Cargo Claim under the applicable law of the charter party agreement, *i.e.* English law.

119.    An eight (8) figure Cargo Claim would be a significant claim on the loss record for The American Club, its members Adamastos Shipping and Phoenix Shipping, and its Chairman.

120.    This was especially so given the fact that at the time that the Vessel entered into the charter party agreement with Pacific Gulf, there was only approximately $6,000 in the Adamastos Shipping bank account and the Vessel was only earning $9,000 per day in hire.

121.    Furthermore, the Vessel was mortgaged for over $24,000,000, despite having a market value of no more than $6,000,000.

122.    The Cargo Claim would also be a significant and large claim on the loss record for

The American Club to pass on to the International Group pool, as a claim well in excess of $10,000,000.

123.    In the 2014 Annual Report, The American Club reported only seven (7) claims in 2014 which exceeded $1,000,000 and that 98% of incidents fell within the "attritional layer of up to $250,000 per case."  A copy is attached as Exhibit 8.

124.    Cargo Claims in particular were described as "particularly modest in 2014" and The American Club explained that the average cost per claim was only approximately $41,000 in 2014. *Id*.

125.    Furthermore, "the development of International Group Pool claims was . . . comparatively modest at policy year end, with only ten incidents reported an overall exposure for the Club's account of just under $5,000,000." *Id*.

126.    The individuals associated with The American Club who participated in the scheme to avoid liability have all been promoted to executive positions within the The American Club's organization, including but not limited to Dorthea Ioannou, Donald Moore, and George Gourdomichalis.

127.    It is clear that the M/V ADAMASTOS Cargo Claim was a significant claim which undoubtedly would have been the largest claim faced by The American Club for the 2014 policy year. *Id*.

128.    In fact, in the years 2010 – 2014, The American Club reported that claims totaled approximately $55,000,000.  *Id*.

129.    The estimated Cargo Claim from Marubeni at the time that The American Club terminated coverage for the Vessel was nearly 60% of the total value of claims which The American Club had collectively handled in the prior five (5) years.

130.    In addition, February 20th of each year is the deadline for renewals for P&I Insurance for members who are entered with clubs in the International Group, including The American Club.

131.    Premiums for P&I Insurance are based on several factors, but chief among them is the member's claim and loss history.  A sizeable claim can cause the next year's premium to be substantially higher.

132.    At all material times, George Gourdomichalis and Stathis Gourdomichalis were in the process of commencing their new business Blue Wall Shipping Ltd. and had spent the year 2014 acquiring six (6) handysize and handymax vessels.

133.    All of the vessels in the Blue Wall fleet were also technically managed and commercially operated by Phoenix Shipping and all of the vessels were entered with The American Club at the direction and coordination of George Gourdomichalis.

134.    Phoenix Shipping was the "Business Group" for all of the vessels and the procurement of insurance was done on a group basis with the Blue Wall vessels.

135.    Rather than satisfy the covered Cargo Claim consistent with the Certificate of Entry and applicable P&I covered claims, George Gourdomichalis, Stathish Gourdomichalis, SCB, and The American Club agreed, conspired, confederated, and/or otherwise determined that the Vessel, her crew, and her cargo would be abandoned, and no claims would be paid.

136.    The abandonment of the Vessel and self-serving rejection of coverage for the P&I covered Cargo Claim was done with the express intent to avoid paying the covered, but unrecoverable losses to the detriment of Plaintiff and to benefit Defendants George Gourdomichalis, Stathis Gourdomichalis, The American Club, and SCB.

137.    Rather than exercise any and all rights against Adamastos Shipping, George

Gourdomichalis, Stathis Gourdomichalis, and/or Phoenix Shipping, The American Club agreed to the abandonment of the Vessel and walked away from the Cargo Claim.

138.    The reason was simple, a self-serving exit from the Vessel on technical grounds would avoid the significant loss and claim from Marubeni on The American Club's ledger.

139.    Instead of taking all steps to remove someone like George Gourdomichalis from the Board of Directors, whose companies failed, neglected, and refused to pay and honor their contractual obligations; The American Club elected him Chairman of the Board of Directors in June 2018.

140.    Individuals at The American Club associated with the handling of the claim, including but not limited to Mr. Donald Moore and Ms. Dorthea Ioannou were promoted.

141.    The Defendants' actions have caused damages to Plaintiff in the amount of no less than $18,500,000, plus applicable interest, costs, and fees.

## COUNT I – *PRIMA FACIE* TORT

142.    Plaintiff restates and re-alleges paragraphs 1 – 141 in the above foregoing Complaint as if set forth herein.

143.    At all material times, Defendants by and through their actions caused the intentional infliction of harm to Plaintiff by abandoning the M/V ADAMASTOS in Brazil and improperly rejecting, refusing, and/or failing to pay for a Cargo Claim which was clearly covered by the applicable P&I Insurance.

144.    The result of the Defendants' actions caused special damages in an amount of no less than $18,500,000 for the Cargo Claim.

145.    Defendants actions were without excuse or justification and were done solely by the self-serving motivation to preserve the loss claim record of George Gourdomichalis, Stathis

Gourdomichalis, and The American Club.

146.    The Defendants acted with malicious intent and impunity to shirk their obligations to respond to the claim and resolve the matter before it ballooned into the significant Cargo Claim loss that occurred.

147.    But for the actions by The American Club and its Chairman George Gourdomichalos and Stathis Gourdomichalis to implement a strategy to inequitably avoid paying a significant claim which clearly was a covered claim, Plaintiff would not have suffered the damages, costs, and expenses suffered to date.

148.    Accordingly, Plaintiff requests that the Court enter judgment in favor of Plaintiff and against Defendants, jointly and severally, in the amount of no less than $18,500,000, plus applicable interest, costs, and fees.

## COUNT II – PROMISSORY FRAUD

149.    Plaintiff restates and re-allege paragraphs 1 – 141 in the above foregoing Complaint as if set forth herein.

150.    SCB and The American Club repeatedly made statements by and through their representatives, including but not limited to George Gourdomichalis and Stathis Gourdomichalis, that the M/V ADAMASTOS incident would be timely and adequately responded to.

151.    Notwithstanding Plaintiff's good faith belief that Defendants were working towards a solution for the continued handling of the matter, the rectification of the deficiencies and accruing claims in Brazil and the Vessel's completion of her voyage to deliver cargo to China; Defendants had no plan or intention to honor their obligations to respond to the claim(s) and/or prevent the escalation of significant damages.

152.    Defendants' representations were made with the self-serving intent to prevent

significant claims from accruing on The American Club's loss record and deceived Plaintiff into believing that a response and/or solution to the Vessel's position would be coming forward soon.

153.    Plaintiff reasonably relied on Defendants' representations, but sustained significant injury as a result of the fraudulent actions by Defendants.

154.    Accordingly, Plaintiff requests that the Court enter judgment in favor of Plaintiff and against Defendants, jointly and severally, in the amount of no less than $18,500,000, plus applicable interest, costs, and fees.

### COUNT III – CIVIL CONSPIRACY

155.    Plaintiff restates and re-allege paragraphs 1 – 154 in the above foregoing Complaint as if set forth herein.

156.    Upon information and belief, George Gourdomichalis, Stathis Gourdomichalis, and The American Club/SCB entered into an agreement or series of agreements to abandon the M/V ADAMASTOS in Brazil and refuse to cover the Cargo Claim caused by the unseaworthy Vessel.

157.    The Defendants purposefully cancelled the P&I Coverage for the M/V ADAMASTOS despite the existence of a significant and covered claim to self-servingly avoid the Cargo Claim being recorded as a loss for the Vessel, George Gourdomichalis, Stathis Gourdomichalis, Phoenix Shipping, the Blue Wall fleet, and/or on The American Club's record.

158.    The Defendants participated in, confederated, and/or carried-out this common purpose or plan as there was significant benefit for the Defendants to avoid the liability and significant damages caused by the unseaworthy M/V ADAMASTOS.

159.    As a direct result of Defendants actions, Plaintiff suffered damages of no less than $18,500,000, plus applicable interest, costs, and fees.

## COUNT IV – UNJUST ENRICHMENT

160.    Plaintiff restates and re-allege paragraphs 1 – 141 in the above foregoing Complaint as if set forth herein.

161.    Plaintiff paid and settled the Cargo Claim which arose as a direct result of the unseaworthy Vessel, the M/V ADAMASTOS, which was unilaterally and inequitably abandoned by the Defendants.

162.    Defendants have retained the benefit of the Plaintiff's payment and settlement of the Cargo Claim and have failed, neglected, and/or refused to take responsibility for the covered claim.

163.    As such, Defendants have been unjustly enriched at the expense of Plaintiff in the amount of no less than $18,500,000, plus applicable interest, costs, and fees.

## COUNT V - NEGLIGENCE

164.    Plaintiff restates and re-allege paragraphs 1 – 141 in the above foregoing Complaint as if set forth herein.

165.    Defendants owed a duty to Plaintiff GREAT LAKES and Pacific Gulf to ensure that the M/V ADAMASTOS was, *inter alia*, seaworthy and had proper insurance coverages.

166.    Defendants breached the duty to Plaintiff and failed to exercise reasonable care when devising the scheme to abandon the Vessel, its cargo, and its crew for the benefit of Defendants and to the detriment of Plaintiff.

167.    But for Defendants' breach, Plaintiff would not have incurred damages in the amount of $18,500,000, plus applicable interest, costs, and fees.

168.    Defendants were the direct and proximate cause of the damages suffered by Plaintiff as a result of their negligence.

**WHEREFORE PREMISES CONSIDERED**, Plaintiff pray as follows:

A.      That process in due form of law, according to the practice of this Honorable Court  in matters of admiralty and maritime jurisdiction be issued against Defendants and said Defendants  be cited to appear and answer the allegations of this Complaint;

B.      That a judgment be entered against the Defendants in the sum of **$18,500,000,** plus applicable interest, costs, and fees;

C.      That the Plaintiff have such other, further, and different relief as the Court deems just, proper, and equitable.

|  |  |  |
|---|---|---|
|  |  | Respectfully submitted, |
| Dated: | November 18, 2019<br>New York, NY | CHALOS & CO, P.C. |

By:      /s/ George M. Chalos_____
George M. Chalos, Esq.
Briton P. Sparkman, Esq.
55 Hamilton Avenue
Oyster Bay, New York 11771
Tel: 516-714-4300
Fax: 516-750-9051
Email: gmc@chaloslaw.com
           bsparkman@chaloslaw.com