CHALOS & CO, P.C.
International Law Firm

55 Hamilton Avenue, Oyster Bay, New York 11771
TEL: +1-516-714-4300 • FAX: +1-516-750-9051 • WEB: www.chaloslaw.com • EMAIL: info@chaloslaw.com

June 16, 2020

*Via ECF*

The Honorable Ronnie Abrams
Thurgood Marshall U.S. Courthouse
40 Foley Square, Room 2203
New York, NY 10007

**Re:** *Great Lakes Insurance SA v. American Steamship, et al.*, **Case No. 1:19-cv-10656**
Plaintiff's Supplemental Letter Briefing on the Court's Admiralty Jurisdiction

Dear Judge Abrams:

On June 9th, Your Honor requested the parties to provide briefing on the Court's subject matter jurisdiction (DE 53). Plaintiff Great Lakes Insurance SA in its Own Right and/or as Subrogee of Pacific Gulf Shipping Co. (hereinafter "Great Lakes" or "Plaintiff"), respectfully submits this Supplemental Letter Brief. For the reasons set forth below, it is respectfully submitted that the Court has subject matter jurisdiction to hear Plaintiff's admiralty and maritime claims and the Defendants' motions to dismiss should be denied.

**I.  Factual Background and Procedural History**

On November 18, 2019, Plaintiff commenced the present action against Defendants American Steamship Owners Mutual Protection & Indemnity Association Inc. (hereinafter "The American Club"), Shipowners Claims Bureau Inc. (hereinafter "SCB"), George Gourdomichalis, and Efstathios Gourdomichalis ("George and Efstathios Gourdomichalis) (hereinafter collectively "Defendants") to recover damages arising from Defendants fraudulent and wrongful abandonment of a commercial bulk carrier vessel laden with a high value, perishable cargo, the M/V ADAMASTOS (hereinafter "Vessel") in Brazil.[1] *See* DE 1. Defendants George and Efstathios Gourdomichalis owned the Vessel through an off-shore shell company Adamastos Shipping & Trading, S.A. ("Adamastos Shipping") and operated[2] the vessel through another dominated and controlled entity, Phoenix Shipping & Trading S.A. ("Phoenix Shipping"), which served as the Vessel's technical, operational, and commercial manager. DE 1, at ¶¶ 29-39. George and Efstathios Gourdomichalis, acting through Phoenix Shipping arranged for Defendants, The

---

[1] Plaintiff incorporates the factual allegations contained in the Complaint and summarized in opposition to Defendants' motion to dismiss. *See* DE 1, *see also* DE 33, Statement of Facts pp. 8-12.
[2] Operator means a person who "is responsible for the operation, manning, victualing, and supplying of the vessel." 33 U.S.C. § 1901(a)(9)(a).

1



American Club and SCB, to provide Protection and Indemnity ("P&I")[3] Insurance for the Vessel.[4] *Id.*, at ¶¶46-51. Plaintiff Great Lakes provides P&I insurance to charterers of vessels, such as Pacific Gulf Shipping (hereinafter "Pacific Gulf"), and provides policyholders, with *inter alia*, liability protection for damage to a vessel, for loss of or damage to the cargo, and general liability risks associated with the operation of a commercial, seagoing vessel and its carriage of cargo. *Id.*, at ¶¶ 13-15. Marine insurance, including P&I insurance is a traditional maritime activity and a commonly recognized maritime contract.[5]

Pacific Gulf contracted on a standard NYPE time charter party form with Adamastos Shipping, for use of the Vessel for a period between ninety (90) and one hundred and eighty (180) days.[6] *Id.*, at ¶ 58. A charter party agreement is a maritime contract,[7] pursuant to which Defendant Adamastos Shipping, had numerous obligations, including but not limited to providing a seaworthy vessel "in a thoroughly efficient state in hull, machinery and equipment with inspection certificates necessary to comply with current requirements at ports of call . . . for and during the service" (Clause 1); ensuring "the vessel's equipment shall comply with the regulations and/or requirements in effect at port or ports of call . . . in which the vessel will be employed" (Clause 40); and that "the owners guarantee that the vessel shall be fully covered by [] P&I Club and will remain P&I covered throughout the c/p. The Charterers have the benefit of the Owners' cover granted by the P &I club as far as the rules permit."

The Vessel arrived at the Port of Sao Francisco Do Sul, Rio Grande on July 31, 2014 and commenced loading a high value, perishable cargo of soya beans. *Id.*, at ¶66. On August 4, 2014, the Vessel was inspected by local port state control authorities[8] who discovered no fewer than forty-two (42) deficiencies on the Vessel. *Id.*, at ¶ 67. The Vessel was immediately detained as a result and would not be permitted to depart to continue her journey and trade until the deficiencies were rectified by Defendants and security posted for penalties and damages incurred. *Id.*, at ¶ 68. While under detention and laden with high value cargo, the Vessel broke free of her moorings, drifted in the middle of the channel and grounded. *Id.*, at ¶69. The Vessel was refloated by local salvors and significant claims against the Vessel, her owners, and insurers swiftly mounted. *Id.*, at ¶ 71, ¶ 85. Defendants refused to rectify the deficiencies; failed, neglected, and/or refused to post an adequate security bond in Brazil to permit the release of the Vessel; failed to load the remainder of the cargo; and failed to complete the voyage as required under the charter party obligations. The high value perishable cargo suffered significant and costly damage. *Id.*, at ¶¶ 70-88.

---

[3] P&I insurance is specifically designed to address the unique needs of the maritime industry. It covers maritime liability risks associated with the ownership, operation, and/or chartering of a vessel, including third-party risks for damage caused to cargo during transit. *Hartford Fire Ins. Co. v. Mitlof*, 123 F. Supp. 2d 762 (S.D.N.Y. Dec. 15, 2000).
[4] George Gourdomichalis was a member of the board of directors of The American Club (and subsequently became its Chairman of the Board). *See* De 1, at ¶¶ 56-57.
[5] *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 121 (2d Cir. 2001) ("[f]ederal admiralty jurisdiction extends to cases involving marine insurance contracts.").
[6] Pacific Gulf sub-chartered the Vessel to Intergis Co Ltd., who sub-chartered the Vessel to Marubeni Corporation. *See* DE 1, at ¶63, ¶65. All of the back-to-back charter party agreements are maritime contracts.
[7] *Fednav, Ltd. v. Isoramar, S.A.*, 925 F.2d 599 (2d Cir. 1990) ("It is well-established that a charter party agreement is a maritime contract.").
[8] Port State Control (PSC) is the inspection of foreign ships in national ports to verify that the condition of the ship and its equipment comply with the requirements of international regulations and that the ship is manned and operated in compliance with these rules. www.imo.org/en/OurWork/MSAS/Pages/PortStateControl.aspx.

Rather than honor their obligations to pay the claims which were covered under the P&I insurance policies issued by The American Club and SCB, Defendants instead confederated, schemed, and conspired to abandon the Vessel, her crew, and the cargo in an effort to avoid paying what is properly due and owing to Plaintiff (and its insured). *Id.*, at ¶¶ 89-141. Plaintiff's Complaint asserts five (5) causes of action against Defendants for (1) *prima facie* tort; (2) promissory fraud; (3) civil conspiracy; (4) unjust enrichment; and (5) negligence. *Id.* Defendants' conduct caused significant damages to Plaintiff, as Great Lakes was inequitably left "holding the bag" for at least $18,500,000 in cargo damage claims which it settled with the sub-charterers of the Vessel. *Id.*, at ¶¶ 142-168.

## II.     Subject Matter Jurisdiction

The U.S. Constitution extends the district court's judicial power "to all cases of admiralty and maritime jurisdiction." U.S. Const. Art. III, § 2. Congress codified the district court's judicial power in admiralty cases at, *inter alia*, 28 U.S.C. § 1333(1) and granted the district courts original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1). As the United States Supreme Court stated in *Foremost Ins. Co.*, "the primary focus of admiralty jurisdiction is unquestionably the protection of maritime commerce." *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 674, 102 S. Ct. 2654, 73 L. Ed. 2d 300 (1982); *see also LeBlanc* v. *Cleveland*, 198 F.3d 353, 356 (2d Cir. 1999). Here, the district court must undertake a two-part analysis to determine whether the tort claim(s) satisfy both the (i) "location test", *i.e.* that the tort occurred on navigable waters and (ii) the "connection test," in which the Court must satisfy itself that general nature and features of the activity or incident shows a substantial relationship to traditional maritime activity. *See Jerome B. Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534, 115 S. Ct. 1043, 130 L. Ed.2d 1024 (1995); *see also Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) ("the plaintiff need only make a *prima facie* showing of [subject matter] jurisdiction.").

### A. The Location Test is Easily Satisfied

The Court is asked to determine "whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." *Grubart*, 513 U.S. at 534.  In *Executive Jet Aviation, Inc.*, the Court noted that under the locality test, the tort 'occurs' where the alleged conduct took effect. *Exec. Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 266, 93 S. Ct. 493, 34 L. Ed. 2d 454 (1972); *see also Malaysia Int'l Shipping Corp. v. Sinochem Int'l Co.*, 436 F.3d 349, 356 (3d Cir. 2006) (finding subject matter jurisdiction over a wrongful arrest tort claim wherein the plaintiff alleged that the defendant's misrepresentations to the Chinese Admiralty Court caused the seizure of the vessel while at a port in China and therefore the "effect" of the tort undisputedly occurred on navigable waters where the vessel was seized).

There is no dispute that Defendants' failure to provide a seaworthy Vessel caused the Brazilian Port State authorities to detain the Vessel while on navigable waters. The deficiencies were exacerbated by the Vessel's grounding and the failure, neglect, and/or refusal of Defendants to repair the Vessel, post the required surety bond for the claims, protect the high value perishable cargo, and otherwise do the necessary to put the Vessel back into service.  As part of the scheme to avoid paying the significant cargo claim, Defendants George and Efstathios Gourdomichalis

3


organized, confederated, and/or conspired with Defendants, The American Club[9] and SCB, to self-servingly, dishonestly, and improperly cancel the P&I insurance coverage on the Vessel. This scheme was accomplished by and through, *inter alia*, George and Efstathios Gourdomichalis' unilateral and untruthful notice to the Greek government that Phoenix Shipping's operation and management of the Vessel was cancelled. *See* DE 1, ¶89. The "cancellation notice" was then passed to The American Club and SCB, who in turn, utilized it as a false pretense to cancel the Vessel's P&I insurance coverage. *Id.*, at ¶¶ 91-92. There is no dispute that the effect and injury caused by the Defendants' conduct occurred in navigable waters. As such, the claim satisfies the location test under *Grubart* and this Court properly has subject matter jurisdiction. *See Sea Trade Mar. Corp. v. Coutsodontis*, 2012 U.S. Dist. LEXIS 119206 (S.D.N.Y. Aug. 16, 2012); *Panama R. Co. v. Napier Shipping Co.*, 166 U.S. 280, 285, 17 S. Ct. 572, 41 L. Ed. 1004 (1897) ("[T]he law is entirely well settled ... that torts originating within the waters of a foreign power may be the subject of a suit in a domestic court.").

### B. The Connection with Maritime Activity Test is Satisfied

Under *Grubart*, the Court must also consider the action's connection to maritime activity. The Court will examine: (1) "'the general features of the type of incident involved' to determine whether the incident has 'a potentially disruptive impact on maritime commerce'" and (2) "whether 'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'" *Grubart*, 513 U.S. at 534 (quoting *Sisson v. Ruby*, 497 U.S. 358, 363-65, 110 S. Ct. 2892, 111 L. Ed. 2d 292 (1990)).

#### i. *Potential Disruptive Effect on Maritime Commerce*

The first prong of the analysis turns on "a description of the incident at an intermediate level of possible generality." *Grubart*, 513 U.S. at 538. The focus of the analysis is not on the "particular facts" giving rise to the incident but "whether the 'general features' of the incident [a]re likely to disrupt commercial activity." *Id.* at 538. (internal citation omitted). The incident here, *i.e.*, failure to provide a seaworthy vessel fit for her intended service, her subsequent detention, grounding, and the ultimate abandonment of the Vessel, her crew, and its high value cargo in navigable waters, posed a serious threat and was a major disruption to maritime commerce. The detention and grounding of a vessel created obstructions to the passage of commercial ships in and out of the port, halted port operations, delayed the loading/discharge of cargo operations, backed up vessel arrivals/departures, and interfered with the shipboard employment of the crew and their subsequent repatriation. *See e.g.*, *Parker v. Malletts Bay Boat Club, Inc.*, 2010 U.S. Dist. LEXIS 101991, at *11 (D. Vt. Sept. 27, 2010) (finding that admiralty jurisdiction because "the accident could have occasioned the response of emergency personnel whose presence and activities, in turn, may have impeded the passage of other vessels"). In addition, the Defendants' torts severely impacted and disrupted the contractual relationship between the sub-charterers of the Vessel, the cargo interests the consignee and ultimate receiver and end-users of the cargo. *DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 200 (E.D.N.Y. Jan. 13, 1999).

---

[9] George Gourdomichalis was a board member of the American Club and was subsequently promoted to Chairman of the Board. *See* DE 1, at ¶¶ 56-57.



### ii. *Substantial Relationship to Traditional Maritime Activity*

As for the second prong, courts will ask "whether a tortfeasor's activity, commercial or noncommercial…is so closely related to the activity traditionally subject to admiralty law that reasons for applying special admiralty rules would apply in the suit at hand."*Grubart*, 513 U.S. at 539-40; *see also Sisson v. Ruby*, 497 U.S. 358, 364, 110 S. Ct. 2892, 111 L. Ed. 2d 292 (1990) ("Our cases have made clear that the relevant 'activity' is defined not by the particular circumstances of the incident, but by the general conduct from which the incident arose."). The U.S. Supreme Court has held that a 'broad perspective' should be used in determining whether the activity underlying a claim has the requisite relationship to maritime activity, and has declined to hold that navigation is the only activity that could satisfy the substantial relationship test. *Sisson*, 497 U.S. at 367. Critically, the Supreme Court in *Sisson* held:

> [T]he fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce, and we have said that that interest cannot be fully vindicated unless ***all*** operators of vessels on navigable waters are subject to uniform rules of conduct. The need for uniform rules of maritime conduct and liability is not limited to navigation, ***but extends at least to any other activities traditionally undertaken by vessels, commercial or noncommercial***.

*Id.* (first emphasis in original) (citations and internal quotation marks omitted).

Here, there can be no question that the activities of Defendants include the ownership, operation, management, and specialized marine insurance of general cargo dry bulk vessels such as the M/V ADAMASTOS and her perishable high value cargo. The Defendants' conduct directly related to and caused the abandonment of the Vessel, her crew, and her cargo and caused the wrongful, self-serving termination of the Vessel's marine (P&I) insurance coverage to the Plaintiff's detriment, all while the Defendants were carrying out their traditional maritime activity. *See Germain v. Ficarra*, 824 F.3d 258, 274-75 (2d Cir. 2016) (the Second Circuit found the "transport and care of passengers on a vessel on navigable waters or the more specific anchoring of a vessel without warning of the attendant dangers – are substantially related to traditional maritime activity."). Simply put, the case in controversy falls squarely within the Court's subject matter jurisdiction.

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests that this Court deny Defendants' motions to dismiss, set a schedule for the litigation to proceed on the merits, and grant such other and further relief as may be just and proper under the facts and circumstances of this matter.



Dated: June 16, 2020
    Oyster Bay, New York

                                        Respectfully submitted,

                                        **CHALOS & CO, P.C.**

                                        /s/ George M. Chalos
                                        George M. Chalos, Esq.
                                        Briton P. Sparkman, Esq.

cc: *Via ECF Only*

*All Counsel of Record*