UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 8/6/2020

---

GREAT LAKES INSURANCE SE *in its own right and/or as Subrogee of Pacific Gulf Shipping Co.*,

Plaintiff,

v.

AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION INC. *also known as* THE AMERICAN CLUB, SHIPOWNERS CLAIMS BUREAU INC., GEORGE GOURDOMICHALIS, AND EFSTATHIOS GOURDOMICHALIS,

Defendants.

No. 19-CV-10656 (RA)

<u>OPINION & ORDER</u>

---

RONNIE ABRAMS, United States District Judge:

Plaintiff Great Lakes Insurance SE ("Great Lakes" or "Plaintiff") filed this action, in its own right and as subrogee of its insured, Pacific Gulf Shipping Co. ("Pacific Gulf"), against Defendants American Steamship Owners Mutual Protection and Indemnity Association Inc. a/k/a The American Club ("The American Club"), Shipowners Claims Bureau Inc. ("SCB"), George Gourdomichalis, and Efstathios Gourdomichalis (together, "the Gourdomichalises," and collectively with The American Club and SCB, "Defendants") asserting tort claims based on Defendants' alleged conspiracy to wrongfully abandon the M/V ADAMASTOS (the "Vessel") in Brazil and to improperly terminate the Vessel's insurance coverage.  Now before the Court is The American Club's motion to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and as a sanction under Rules 37 and 65, and the Gourdomichalises' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(5), 12(b)(6), and as a sanction under Rule 37.  For the reasons that follow, this action is dismissed for lack of subject matter jurisdiction.

## BACKGROUND[1]

### I.      The Parties and Other Relevant Entities

### A.  The Parties

Plaintiff Great Lakes is a German-based insurance company that provides, among other things, "specialized marine insurance polic[ies] for charterers," including "liability protection for . . . liability for loss of/damage to the chartered vessel, liability for loss of/damage to the cargo being carried, and other general liability risks associated with the operation and carriage of cargo which might arise."  Compl. ¶¶ 13-14.  In the maritime industry, the "specialized marine insurance for liability" that Great Lakes provides is often referred to as "Protection & Indemnity Coverage," or "P&I insurance."  *Id.* ¶ 15.

Defendant The American Club is an insurance company that is "duly qualified pursuant to the laws of the State of New York" and does business in this District "through its authorized representative located in New York, New York."  *Id.* ¶ 7.  The American Club provides "protection and indemnity insurance, which covers vessel owners and charterers against third-party liabilities arising from the ownership and operation of insured vessels."  *Id.* ¶ 6.  In particular, it provides P&I insurance to cover "shipowners, operators, and charterers for third-party liabilities encountered in the commercial operation of entered vessels, including but not limited to, claims for cargo loss, shortage, or damage, collision, pollution, crew repatriation and substitution, loss of life, injury and illness of crew, passengers and other persons, and various other covered liabilities."  *Id.* ¶ 26.  Defendant SCB is a company, "incorporated under the laws of the State of New York and doing business in this jurisdiction," that manages The American Club.  *Id.* ¶¶ 8-9.  According to

---

[1] The following facts are drawn primarily from Plaintiff's Complaint, Dkt. 1 ("Compl.") and the exhibits attached thereto, and are assumed to be true for the purpose of resolving this motion.  *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).

the Complaint, both The American Club and SCB maintain "a principal executive office and place of business" in New York, New York.  *See id.* ¶ 12.

Defendants George and Efstathios Gourdomichalis are Greek residents and citizens who, Plaintiff contends, "regularly travel[] to and conduct[] business in New York."  *Id.* ¶¶ 10-11. Additionally, George Gourdomichalis is—and has been at all relevant times—a member of The American Club's Board of Directors, *see id.* ¶¶ 10, 55, including by serving as the Chairman of the Board since approximately June 21, 2018, *id.* ¶ 57.

**B.  The Gourdomichalises' Companies**

Plaintiff alleges that the Gourdomichalises "have a long history of unsuccessful ship-owning interests which have previously failed and left various creditors and contractual partners with significant losses and damages."  *Id.* ¶ 32.  Two of their alleged "brass-plate" companies are relevant to the instant action.  First, Adamastos Shipping & Trading, S.A. ("Adamastos Shipping") is a company, with a registered address in Liberia, that the Gourdomichalises "beneficially owned and operated" at all relevant times.  *See id.* ¶¶ 30-31.  Second, in 2011, the Gourdomichalises founded Phoenix Shipping & Trading, S.A. ("Phoenix Shipping") in order to allegedly "create a new business for [the Gourdomichalises] following the failure of their previous shipping companies," including those named "Naftiki Eteria, Free Bulkers, and G. Bros Maritime S.A."  *Id.* ¶¶ 33-34.  Phoenix Shipping was incorporated in the Marshall Islands, and has its principal place of business in Greece.  *See id.* ¶ 33.  According to the Complaint, George Gourdomichalis is the President and Chief Executive Officer of Phoenix Shipping, and Efstathios Gourdomichalis is its "Secretary/Treasurer" and Chief Operating Officer.  *Id.* ¶ 36.

II.     **The Vessel**

The M/V ADAMASTOS—i.e., the Vessel—"was a 39,017 gross ton dry bulk vessel built in 1995 and registered in Liberia." *Id.* ¶ 29.  Adamastos Shipping was apparently the Vessel's "registered owner." *See id.* ¶ 30.  Plaintiff alleges that, at all relevant times, the Vessel (and Adamastos Shipping) were "beneficially owned and operated by" the Gourdomichalises. *See id.* ¶ 31.  In particular, the Vessel was acquired by the Gourdomichalises through Adamastos Shipping in 2012. *See id.* ¶ 37.  Plaintiff asserts that George Gourdomichalis was the "sole signatory on the 2012 first preferred mortgage for the Vessel." *Id.*  It alleges further that the Gourdomichalises "acquired the Vessel through a complex, veiled financing scheme in order to permit [them] to take possession and ownership of a vessel without risk," *id.* ¶ 44, and that "not a single payment was made on the preferred ship mortgage" during the time the Gourdomichalises "beneficially owned and operated" the Vessel, *id.* ¶ 45.  Plaintiff also contends that "[n]o capital and/or other consideration was required for the purchase of the Vessel." *Id.* ¶ 43.  According to Plaintiff, the Vessel had a "fair market value" of "no more than" $6 million, but was "mortgaged for four []times its value," i.e., $24 million. *See id.* ¶¶ 41-42; *see also id.* ¶ 121 (alleging that "the Vessel was mortgaged for over $24,000,000, despite having a market value of no more than $6,000,000").

Plaintiff maintains that Phoenix Shipping served as the "technical and commercial manager for the Vessel" pursuant to an agreement dated December 7, 2012, *see id.* ¶ 38, as well as the "operator" of the Vessel, *see id.* ¶ 39.  As the manager for the Vessel, Phoenix Shipping was apparently "required to run all aspects of [its] and [of] Adamastos Shipping's business, including all chartering operations, crew management, technical management, commercial management, insurance arrangements, and accounting services for the Vessel." *Id.* ¶ 38.  Plaintiff asserts further that the "operator" of a vessel "is responsible for the operation, manning, victualing, and supplying

of the vessel." *Id.* ¶ 39 (quoting 33 U.S.C. § 1901(9)).  As such, Plaintiff alleges, Phoenix Shipping "made all decisions concerning the commercial operation, technical operation, management, crewing, chartering, and the placement and procurement of the insurance coverage" for the Vessel, *id.* ¶ 46, and the Gourdomichalises "performed all banking operations, financial recordkeeping, and maintained all accounts for and on behalf of the Vessel," *id.* ¶ 47.

## III.    The Insurance Policies

### A.  Great Lakes' Insurance Coverage

As noted above, P&I insurance is a type of specialized maritime insurance that "provides policyholders with liability protection for, among other things, liability for loss of/damage to the chartered vessel, liability for loss of/damage to the cargo being carried, and other general liability risks associated with the operation and carriage of cargo which might arise." *Id.* ¶¶ 14-15; *see also* American Club Mot. at 3 n.1 (explaining that P&I insurance "covers certain traditional liabilities of a vessel owner encountered in the operation of seagoing vessels such as loss of life or injury to crew and wreck removal").  Great Lakes authorizes a separate entity, Michael Else & Company Ltd. ("MECO") to issue its "specialized marine liability insurance policies on its behalf," which MECO does "by and through [its] insurance brand," known as "The Charterers P&I Club" (the "Charterers Club").  Compl. ¶ 16.

Pacific Gulf is a Marshalls Island company "in the business of chartering vessels in the dry bulk sector for the transportation of goods, materials, and cargo worldwide," which obtained liability P&I insurance from the Charterers Club on approximately November 12, 2013.  *Id.* ¶¶ 18-19.  Specifically, the insurance that Pacific Gulf obtained provided liability coverage of up to $50 million for "any one accident or occurrence," as well as coverage as to "defense costs, fees, and expenses" up to $1 million for "any one accident or occurrence."  *Id.* ¶ 20.  Pursuant to the

Certificate of Insurance issued by MECO through the Charterers Club, the Vessel was "added by Pacific Gulf" as a "covered vessel." *Id.* ¶ 21.

As detailed below, Pacific Gulf entered into a charter party agreement with Adamastos Shipping for use of the Vessel. *See id.* ¶ 58. Pacific Gulf subsequently entered into a sub-charter party agreement with Intergis Co., Ltd. ("Intergis"), *see id.* ¶ 63, a Korean company that, like Pacific Gulf, "is in the business of chartering and operating vessels in the dry bulk sector for the transportation of goods, materials, and cargo worldwide," *id.* ¶ 23. On approximately August 28, 2013, Intergis obtained "liability P&I insurance" from the Charterers Club, which provided liability coverage of up to $50 million for "any one accident or occurrence," as well as coverage as to "defense costs, fees, and expenses" up to $2 million for "any one accident or occurrence." *See id.* ¶¶ 24-25.

## B. The American Club's Insurance Coverage

According to the Complaint, The American Club provided a P&I insurance coverage policy to the Vessel. *See id.* ¶ 48. Plaintiff alleges that this insurance policy was provided to the Vessel "because George Gourdomichalis was a member of The American Club Board of Directors," *id.* ¶ 49, and that "[n]o further inquiry as to viability of Adamastos Shipping and/or the true condition of the Vessel was considered and/or completed by The American Club," *id.* ¶ 50. It alleges further that The American Club provided P&I insurance coverage to the Vessel, and "her Owning, Operating, and Managing Interests," even though the Vessel "was encumbered with a preferred ship mortgage four [] times above the value of the asset" and notwithstanding that Adamastos Shipping "had no physical address, no employees of its own, and no value or capital." *Id.* ¶ 48. Specifically, The American Club issued a "Certificate of Entry for Class I – Protection & Indemnity Insurance for the M/V ADAMASTOS for the period of February 20, 2014 – February

20, 2015," in which Adamastos Shipping was named as the "member" and Phoenix Shipping was listed as the "co-assured." *See id.* ¶¶ 51-52.

Additionally, The American Club provided "Freight, Demurrage & Defense," or "FD&D," insurance coverage to the Vessel. FD&D insurance "provides members with cover for claims handling assistance and legal costs in relation to disputes which are outside the scope of P&I or Hull & Machinery insurance." *Id.* ¶ 53 n.2; *see also* American Club Mot. at 4 n.3 (explaining that FD&D insurance "provides discretionary coverage for legal costs and expenses not covered by P&I and hull insurance coverage"). In particular, The American Club issued a "Certificate of Entry for Class II – Freight, Demurrage & Defense ('FD&D') Insurance for the M/V ADAMASTOS for the period of February 20, 2014 – February 20, 2015." Compl. ¶ 53.

## IV.   The Relevant Agreements

### A.   Charter Party Agreement Between Pacific Gulf and Adamastos Shipping

On approximately April 8, 2014, Pacific Gulf entered into a charter party agreement with Adamastos Shipping "for use of the [Vessel] for a period between [90] and [180] days." *See id.* ¶ 58. Plaintiff contends that this charter party agreement, which "is a maritime contract," *id.* ¶ 60, "set forth specific terms, rights, and obligations between the parties including the obligation to have P&I coverage on the Vessel," *id.* ¶ 59. Pursuant to the terms, Pacific Gulf agreed to pay Adamastos Shipping $9,000 per day, including overtime, "payable ten [] days in advance," plus $130,000 "gross ballast bonus," "payable every fifteen [] days in advance and in exchange for the use of a seaworthy vessel." *Id.* ¶ 61. Plaintiff asserts that Pacific Gulf "complied with all obligations under the terms of the charter party agreement," and ultimately "paid $1,114,365 in charter hire during the course" of the agreement. *See id.* ¶ 62. Plaintiff also contends that, at the time "the Vessel" entered into the charter party agreement with Pacific Gulf, "there was only

approximately $6,000 in the Adamastos Shipping bank account and the Vessel was only earning $9,000 per day in hire." *Id.* ¶ 120.

### B. Sub-Charter Party Agreements

On approximately June 14, 2014, Pacific Gulf, "as disponent owner[] of the Vessel," entered into a sub-charter party agreement with Intergis for a one-time charter trip of "one [] laden leg *via* Brazil to Singapore-Japan range carrying lawful/harmless grain products in bulk." *Id.* ¶ 63. Plaintiff asserts that the Vessel was "added by Intergis" as a "covered vessel" pursuant to the Certificate of Insurance issued by MECO through the Charterers Club. *See id.* ¶ 64. According to Plaintiff, Intergis subsequently "sub-chartered the Vessel" to Marubeni Corporation ("Marubeni"), a company that "arranged for the transportation of a soyabean cargo to be carried by the Vessel." *Id.* ¶ 65.

## V.    The Incident in Brazil

### A.  The Grounding Incident

According to the Complaint, the Vessel arrived in Sao Francisco Do Sul, Rio Grande, Brazil on approximately July 31, 2014. *See id.* ¶ 66. On August 1, 2014, it "commenced loading the cargo of soyabeans starting at 0120 hours LT." *Id.* A few days later, on approximately August 5, 2014, the Vessel was inspected by "local Port State Control authorities in Brazil," who allegedly discovered "no fewer than [42] deficiencies with the Vessel," and thereafter "detained the Vessel pending further investigation and rectification of [those] deficiencies." *See id.* ¶¶ 67-68.

Plaintiff alleges that at approximately "1855 hours LT on August 6, 2014," and "while still loading cargo," the Vessel "broke free of her moorings, drifted to the middle of the channel, and grounded." *Id.* ¶ 69. At that time, the Vessel apparently had "approximately 59,674.680 metric tons of soyabeans onboard." *Id.* ¶ 70. Plaintiff asserts that the Vessel first "commenced refloating

operations with her own engines," and then with "the assistance of tugs and pilots, as well as by Salvors, Rebocadores do Brasil SA," was ultimately "refloated" on August 7, 2014. *See id.* ¶ 71. According to Plaintiff, the Vessel was subsequently "shifted to the inner anchorage north of the terminal." *Id.* ¶ 72.

Plaintiff asserts that after the grounding incident, "the terminal would not permit the Vessel to re-berth alongside to load the remaining cargo without meeting various conditions, including but not limited to the posting of a security bond." *Id.* ¶ 73. It contends that Adamastos Shipping, Phoenix Shipping, the Gourdomichalises, and/or The American Club failed or refused to comply with "the terminal requirements," and the "Port Captain" thus "ordered the Vessel to shift to the outer anchorage, given the Vessel's draft and the Port State Control deficiencies and detention imposed on the Vessel." *Id.* ¶ 81.

Plaintiff alleges that, on approximately August 12, 2014, The American Club was "expressly notified" of "the grounding incident in Brazil and the potential claim for which Adamastos Shipping had both P&I Insurance coverage and FD&D Insurance coverage." *Id.* ¶ 74. In particular, The American Club was apparently notified of the incident "by its member, Adamastos Shipping, by and through George Gourdomichalis," *see id.*, who allegedly contacted The American Club's "current chief Commercial Officer, Dorothea Ioannou to notify [it] of the incident and to seek advice concerning the potential declaration of General Average," *id.* ¶ 75. Plaintiff alleges that The American Club thereafter "transferred the matter to [its] New York office," which "handles matters and claims which occur in North and South America," *id.* ¶ 76, and "opened both FD&D and P&I claim files" in connection with the incident, *see id.* ¶ 77. It also alleges that The American Club "acknowledged that the incident was of 'great concern,'" particularity in light of "its exposure" for potentially large claims arising out of it. *See id.* ¶ 80.

Plaintiff maintains that, as of September 2014, the "value of the cargo onboard" the Vessel "was known to be no less than" $18 million.  *See id.* ¶ 117.

### B.  Defendants' Alleged Failures With Respect to the Incident

During the six months following the incident in Brazil, the Vessel allegedly "remained under detention, failed to load the remainder of the cargo, and failed to complete the voyage as required under the various charter party obligations."  *Id.* ¶ 82.  Plaintiff asserts that, during this period, "numerous claims and causes of action were commenced against the Vessel by various third parties in Brazil," *id.* ¶ 85, and that such claims accrued "as a result of the grounding in Brazil" and Defendants' failure and/or refusal "to return the Vessel to service so that she could complete the voyage," *id.* ¶ 88.  Among these claims was the "impending cargo claim for the loss of over 59,000 metric tons of soyabeans," which was a "covered claim[] under the applicable P&I insurance policies issued by The American Club and the Charterers Club."  *Id.* ¶ 88.

Plaintiff asserts that Adamastos Shipping, Phoenix Shipping, and the Gourdomichalises "unconscionably abandoned the Vessel, her crew, and her cargo," and did not "honor their respective obligations to the Vessel's contractual partners, the cargo [or] the crewmembers."  *Id.* ¶ 83.  Phoenix Shipping, for instance, allegedly "did not seek repair estimates for the [Vessel], did not provide budget proposals for repair work, and did not send any written demands for payment to Adamastos Shipping for any of the items which needed to be rectified and the claims which needed to be settled in Brazil," even though it was the Vessel's operator and technical and commercial manager.  *Id.* ¶ 87.  Plaintiff asserts further that The American Club similarly abandoned "its obligations as insurer of the Vessel" and "to cover the covered claim(s)."  *Id.* ¶ 84.

### C. Abandonment of the Vessel and Termination of Coverage

Plaintiff alleges that Defendants conspired to abandon the Vessel in Brazil in January 2015 in order to "avoid paying a large uncollectible [] claim and/or a large cargo claim." *See id.* ¶¶ 1, 98. Specifically, on January 7, 2015, Phoenix Shipping "purportedly submitted a letter to the Greek government, asserting that Phoenix Shipping had ceased operations of the [Vessel]." *Id.* ¶ 89. Plaintiff asserts that this letter "was silent on [Phoenix Shipping's] technical and/or commercial management obligation(s) and/or insurance coverages," *id.*, and that "[n]o contemporaneous written notice of the termination of management services was ever provided from Phoenix Shipping to Adamastos Shipping," *id.* ¶ 90. Plaintiff asserts further that "[i]mmediately thereafter," George and/or Efstathios Gourdomichalis "provided notice through an email from Phoenix Shipping to The American Club that the management services contracted by their closely held owning company had been unilaterally terminated by Phoenix Shipping." *Id.* ¶ 91. As a result, The American Club terminated its coverage for the Vessel on January 8, 2015. *See id.* ¶ 92. It did so by providing notice to Adamastos Shipping and the Vessel, informing them "that P&I and FD&D Coverage for the Vessel had been terminated" due to "change of management." *Id.*

On February 12, 2015, the Vessel was apparently "declared abandoned by Brazilian authorities." *See id.* ¶ 99. Plaintiff contends that ultimately, "the Vessel and its damaged cargo" were "sold to third-party salvors who transported [it] to Spain and sold the abandoned soyabean cargo for animal feed at a significant loss from its original value." *Id.* ¶ 100. According to Plaintiff, at the time Defendants "walked away from the Vessel," it was "unseaworthy" and "facing tens of millions of dollars in claims, all while fully loaded with a cargo of soyabeans." *Id.* ¶ 1.

Plaintiff maintains that the "wrongful abandonment of the Vessel" was "orchestrated" by Defendants "for their own self-serving purposes" in order to "avoid all contractual and/or legal liabilities associated with the Vessel's port call in Brazil" and to "breach their obligations to the Vessel's contractual partners, cargo interests, and crew." *Id.* ¶ 2. Plaintiff avers that Defendants' actions in "unconscionably abandoning the Vessel" in Brazil has left "nearly $20 million of covered claims unpaid," to the "detriment of others" but to the "benefit of Defendants." *Id.* ¶ 113.

## VI. Subsequent Arbitration

### A. Arbitration by Marubeni Against Intergis

In early 2015, Marubeni commenced an arbitration in London against Intergis, its contractual partner, "seeking to recover damages and losses associated with the loss of the soyabean cargo and claimed damages" in the amount of $32,650,000 (the "Cargo Claim"). *See id.* ¶ 101. According to Plaintiff, the "Cargo Claim" is "a classic claim covered by P&I Insurance for which there was no *bona fide* defense as to liability," and as such, pursuant to English law, "the liability for [this] claim would pass from Intergis to Pacific Gulf to Adamastos Shipping." *See id.* ¶ 103. Plaintiff maintains that the Cargo Claim "arose directly from the unseaworthy nature of the Vessel, which at all times was the responsibility of Adamastos Shipping, Phoenix Shipping, [the Gourdomichalises,] and The American Club." *Id.* ¶ 118. By "late 2014/January 2015," the "Cargo Claim from Marubeni" was allegedly "known to be exceptionally large," i.e., nearly $33 million, as well as "three times (3x) above the individual retention amount for The American Club." *Id.* ¶ 117. Plaintiff asserts that the Cargo Claim was "a significant claim which undoubtedly would have been the largest claim faced by The American Club for the 2014 policy year," *id.* ¶ 127, and that "at the time that The American Club terminated coverage for the Vessel," it accounted for "nearly 60% of the total value of claims which The American Club had collectively handled" in

the prior 5 years, *id.* ¶ 129.  As such, the Cargo Claim would have been "a significant and large claim on the loss record for The American Club . . . , as a claim well in excess of $10,000,000." *Id.* ¶ 122.

On approximately May 23, 2018, "[a]fter significant negotiation, Marubeni's Cargo Claim was settled by Intergis" in exchange for payment of $18 million.  *See id.* ¶ 106.  Plaintiff asserts that this $18 million settlement amount was "paid and satisfied" by itself, "through MECO," on May 25, 2018.  *See id.* ¶ 107.  Specifically, the payment was "sent from MECO on behalf of Intergis to Marubeni's London Solicitors."  *Id.*

### B.  Arbitration by Intergis Against Pacific Gulf

Also in early 2015, Intergis commenced an arbitration in London against Pacific Gulf, seeking "recovery up-the-chain for the damages and losses caused by the Vessel's failure to complete the voyage as contracted for by Marubeni." *See id.* ¶ 102.  On March 13, 2019, the Cargo Claim between Intergis and Pacific Gulf was settled for $18 million, plus $500,000 for costs, for a total of "$18.5 million in the aggregate." *Id.* ¶ 108.  Because Great Lakes "was the underwriter for both Intergis and Pacific Gulf through Certificates of Insurance issued by its managing agent MECO through the Charterers Club," no payment from Pacific Gulf to Intergis was actually required.  *See id.* ¶ 109.  Instead, MECO "adjusted the Pacific Gulf and Intergis claim files to reflect the fact that Intergis had been fully reimbursed for the $18,500,000 and that Pacific Gulf holds the loss on its own Liability File with the Charterers[] Club."  *Id.* ¶ 110.

### C.  Arbitration by Pacific Gulf Against Adamastos Shipping

Finally, on approximately June 6, 2016, Pacific Gulf commenced an arbitration in London against Adamastos Shipping for "breach of the charter party agreement."  *See id.* ¶ 104.  Pacific Gulf brought this arbitration on the grounds that, among other things, "the Vessel was unseaworthy

and not fit for its intended service," arguing that Adamastos Shipping had "breached its obligations and responsibilities under the charter party agreement." *Id.* In the arbitration, Pacific Gulf also sought "indemnity for all claims [it] was facing from Intergis." *Id.* On April 19, 2017—prior to the settlements arising out of the arbitrations brought by Marubeni and Intergis—the "Sole Arbitrator" issued a final award against Adamastos Shipping, and declared that Pacific Gulf was "entitled to be indemnified by Adamastos Shipping for any and all liabilities that Pacific Gulf 'ha[s] or might be found to have in the near future' related to the claims up the charter chain by Marubeni Corporation and Intergis, plus applicable costs, fees, and interest" (the "Final Award"). *Id.* ¶ 105.

Plaintiff contends that although the "loss arising from the Cargo Claim belonged in the first instance to Pacific Gulf," because "this was a fully covered liability claim" and Great Lakes "paid the settlement sum to resolve Mar[u]beni's Cargo Claim," Great Lakes "in its own right and/or as subrogee of Pacific Gulf' is "entitled to recover damages, costs, and interest as a result of the Defendants' tortious actions." *See id.* ¶ 111. According to Plaintiff, Defendants have since "neglected, refused, and/or failed to pay" the "amounts due and owing" under the Final Award. *Id.* ¶ 112. Plaintiff maintains that "[r]ather than satisfy the covered Cargo Claim consistent with the Certificate of Entry and applicable P&I covered claims," Defendants all "agreed, conspired, confederated, and/or otherwise determined that the Vessel, her crew, and her cargo would be abandoned, and no claims would be paid." *Id.* ¶ 135. Plaintiff alleges that Defendants engaged in this "self-serving exit from the Vessel on technical grounds," and this "self-serving rejection of coverage for the P&I covered Cargo Claim," in order to "avoid paying the covered, but unrecoverable losses to the detriment of Plaintiff and to benefit Defendants," and thus, to "avoid the significant loss and claim from Marubeni on The American Club's ledger." *Id.* ¶¶ 136, 138.

**VII.    Procedural History**

Plaintiff Great Lakes filed the instant action on November 18, 2019, asserting claims for prima facie tort, promissory fraud, civil conspiracy, unjust enrichment, and negligence.  Dkt. 1. On December 12, 2019, The American Club and SCB (hereinafter referred to collectively as "The American Club") filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), as well as for sanctions and attorneys' fees pursuant to Federal Rules of Civil Procedure 37 and 65.  Dkt. 19.  On January 17, 2020, Plaintiff filed an opposition, Dkt. 33, and on January 31, 2020, The American Club replied, Dkt. 42.  Separately, on January 17, 2020, George and Efstathios Gourdomichalis filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(5), and 12(b)(6), as well as for sanctions and attorneys' fees and costs under Federal Rule of Civil Procedure 37.  Dkt. 31.  Plaintiff filed its opposition on February 14, 2020, Dkt. 48, and the Gourdomichalises filed their reply on February 24, 2020, Dkt. 51.  On June 16, 2020, the parties submitted additional letter briefs addressing the Court's questions as to subject matter jurisdiction.  *See* Dkt. 54 ("Pl. Ltr."); Dkt. 55 ("Gourdomichalis Ltr."); Dkt. 56 ("American Club Ltr.").  The Court held oral argument as to both motions on July 9, 2020.  *See* Dkt. 60 ("Tr.").

## DISCUSSION

"Federal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute, . . . which is not to be expanded by judicial decree."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted).  As such, "any party or the court *sua sponte*, at any stage of the proceedings, may raise the question of whether the court has subject matter jurisdiction; and, if it does not, dismissal is mandatory."  *Manway Constr. Co., Inc. v. Hous. Auth. of the City of Hartford*, 711 F.2d 501, 503 (2d Cir. 1983).  Indeed, "a district

court must generally . . . establish that it has federal constitutional jurisdiction" before considering other grounds for dismissal.  *See All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 85 (2d Cir. 2006); *see also Seibel v. Frederick*, No. 20 Civ. 2603 (PAE), 2020 WL 1847792, at *2 (S.D.N.Y. Apr. 13, 2020) ("Federal courts have a continuing duty and independent duty to ensure that they possess subject matter jurisdiction, and must dismiss a case—even *sua sponte*— when they find subject matter jurisdiction lacking.").  Because subject matter jurisdiction is a "threshold question that must be resolved . . . before proceeding to the merits" of a case, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998), the Court's analysis begins here.  *See also Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) ("Determining the existence of subject matter jurisdiction is a threshold inquiry[.]").

## I.      Legal Standard under Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  *Id.*  On a 12(b)(1) motion, the Court "must accept as true all material factual allegations in the complaint, but [may not] draw inferences from the complaint favorable to plaintiffs."  *J.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004); *see also Morrison*, 547 F.3d at 170 ("[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.") (citation omitted).  Moreover, "[i]n resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) a district court may consider evidence outside the pleadings."  *Morrison*, 547 F.3d at 170; *see also LeBlanc v. Cleveland*, 198 F.3d 353, 356 (2d Cir. 1999) ("[W]here jurisdictional facts are placed in dispute, the court has the power and

obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits.").

## II.     Admiralty Tort Jurisdiction

Great Lakes asserts that the Court has subject matter jurisdiction over this action based on "admiralty and maritime jurisdiction pursuant to 28 U.S.C § 1333," and because, it contends, this case "involves an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure."[2]  Compl. ¶ 4.  The Gourdomichalises argue that the Complaint should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction because, among other things, Plaintiff's tort claims are "not maritime in nature."  *See* Gourdomichalis Mot. at 1. Although The American Club did not move to dismiss on jurisdictional grounds, it confirmed at oral argument that it too "believe[s] that there is no subject matter jurisdiction in the complaint." *See* Tr. at 17.

The Constitution provides that "[t]he judicial power shall extend . . . to all cases of admiralty and maritime Jurisdiction."  U.S. Const. art. III, § 2.  By statute, Congress has granted federal district courts original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction . . . ."  28 U.S.C. § 1333(1); *see Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531 (1995) ("A federal court's authority to hear cases in admiralty flows initially from the Constitution, which 'extend[s]' federal judicial power 'to all Cases of admiralty and maritime Jurisdiction.'") (quoting U.S. Const. art. III, § 2).  The Second Circuit has further explained that the "primary purpose of federal admiralty jurisdiction is to protect commercial

---

[2] Rule 9(h) provides that "if a claim for relief falls within the federal courts' admiralty jurisdiction, but is also within the court's subject-matter jurisdiction on some other ground—oftentimes, diversity of citizenship . . .—a plaintiff must explicitly designate the claim as an admiralty claim or else forego admiralty's special procedures and remedies." *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 69 (2d Cir. 2012) (citations omitted).

shipping with uniform rules of conduct." *MLC Fishing, Inc. v. Velez*, 667 F.3d 140, 141 (2d Cir. 2011) (quoting *Vasquez v. GMD Shipyard Corp.*, 582 F.3d 293, 298 (2d Cir. 2009)).

Although admiralty jurisdiction typically arises in the context of a maritime tort and/or a maritime contract, "[a]dmiralty *tort* jurisdiction is determined quite differently from admiralty *contract* jurisdiction." *Sirius Ins. Co. (UK) Ltd. v. Collins*, 16 F.3d 34, 37 (2d Cir. 1994) (emphasis added). Here, Great Lakes asserts five tort causes of actions against Defendants: prima facie tort, promissory fraud, civil conspiracy, unjust enrichment, and negligence. All five claims arise out of Defendants' alleged conspiracy to wrongfully abandon the Vessel in Brazil in early 2015, and to wrongfully terminate the applicable maritime insurance coverage for the Vessel, in order to avoid their contractual and insurance liabilities and obligations, including payment of the $18.5 million claim. The Court must thus determine "whether the underlying claims raise a 'civil case of admiralty or maritime jurisdiction' that the district court could hear under 28 U.S.C. § 1333(1)." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 244 (2d Cir. 2014) (citation omitted).

To determine whether a federal court has admiralty jurisdiction over a tort claim, courts apply the two-part test set forth in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995). *Grubart* requires a party seeking to invoke federal admiralty jurisdiction to "satisfy conditions both of location and of connection with maritime activity." *Grubart*, 513 U.S. at 534. As to the "location" inquiry, the court must "determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." *Id.* The "connection" inquiry has two prongs. First, the court "must assess the general features of the type of incident involved . . . to determine whether the incident has a potentially disruptive impact on maritime commerce." *Grubart*, 513 U.S. at 534 (quoting *Sisson v. Ruby*, 497 U.S. 358,

18

363, 364 n.2 (1990)) (internal quotation marks omitted).  Second, the court "must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity."  *Id.* (quoting *Sisson*, 497 U.S. at 364-65, 364 n.2). While not "every tort involving a vessel on navigable waters falls within the scope of admiralty jurisdiction no matter what," the Supreme Court has noted that "ordinarily that will be so."  *Id.* at 543.  If, however, "the tort produces no potential threat to maritime commerce or occurs during activity lacking a substantial relationship to traditional maritime activity," a court may assume that "the objectives of admiralty jurisdiction probably do not require its exercise, even if the location test is satisfied."  *Id.* at 545.

The Second Circuit has recently restated the *Grubart* test as follows: "First, we ask whether the alleged tort meets the location test: that is, whether it occurred on navigable water or was caused by a vessel on navigable water.  Second, we ask whether the alleged tort meets both subparts of the connection test: that is, whether the general type of incident involved has a potentially disruptive effect on maritime commerce, and whether the general character of the activity giving rise to the incident bears a substantial relationship to traditional maritime activity. Only if the location test and both subparts of the connection test are met will admiralty tort jurisdiction be proper under 28 U.S.C. § 1333(1)."  *In re Petition of Germain*, 824 F.3d 258, 269-70 (2d Cir. 2016) (quoting *Tandon*, 752 F.3d at 248).

### A.  Location Test

As to the first requirement—the location of the tort—the Gourdomichalises argue that Plaintiff's claims "fall outside the scope of admiralty jurisdiction" because the alleged tortious conduct that underlies them all—i.e., Defendants' alleged conspiracy to abandon the Vessel and terminate its insurance coverage—occurred not on "navigable waters," but "at offices in Greece

and New York." Gourdomichalis Mot. at 10-11; Gourdomichalis Reply at 3. Nor, they contend, was the injury "caused by a vessel on such waters." Gourdomichalis Mot. at 10-11. The Gourdomichalises argue further that the "direct effects" of Defendants' alleged misconduct—i.e., Plaintiff's "inability to seek reimbursement under the Vessel's [insurance] policies for the amount paid to resolve Marubeni's claim"—also "occurred entirely on land." Gourdomichalis Mot. at 11.[3] Plaintiff, on the other hand, asserts that it has satisfied the location requirement because the Vessel was "doing business on the high seas" and was "docked in Brazil to receive cargo at the time of the incident," and therefore, the "facts giving rise to this action occurred on navigable waters and/or was caused by a vessel on the navigable water." *See* Pl. Opp'n, Dkt. 48, at 7.

The Court concludes that the alleged torts did not occur on navigable water. Plaintiff's tort claims are based on Defendants' alleged "abandonment" of the Vessel in Brazil in 2015, as well as their subsequent termination of insurance coverage and refusal to pay the Cargo Claim—all of which are premised on their purported conspiracy and fraud. Contrary to Plaintiff's suggestion, however, Defendants' conspiracy to abandon the Vessel and terminate its insurance did not occur "on navigable waters." There is no allegation or evidence, for instance, that any of the Defendants were on board the Vessel, or otherwise on navigable waters, when they allegedly conspired to abandon the Vessel or terminate its insurance. Indeed, at oral argument, Plaintiff's counsel admitted that Defendants' alleged torts were "not done on board the Vessel." *See* Tr. at 30. Nor was Plaintiff's alleged injury "caused by a vessel on navigable water." Of course, this action relates—on some level—to events involving a vessel that was docked in Brazil. *See* Compl. ¶¶ 69-73, 76-77, 81-84. But just because the case involves a vessel does not mean that Plaintiff's

---

[3] In their supplemental letter and at oral argument, the Gourdomichalises framed the alleged misconduct underlying Plaintiff's claims somewhat differently—as merely the "frustration of a subrogation claim." *See* Tr. at 5; *see also* Gourdomichalis Ltr. at 2 (arguing that the alleged torts consist of the "alleged 'conspiracy' to frustrate a subrogated cargo underwriter's effort to recover a loss").

injury was *caused by* that vessel.  Here, Plaintiff's claimed injury—arising from the $18.5 million it paid for the Cargo Claim—is a result of Defendants' alleged tortious acts, i.e., their conspiracy to abandon the Vessel and terminate its insurance coverage.  As such, Plaintiff's injury was not caused by a vessel on navigable waters, but rather, it was caused by Defendants' land-based torts.

Courts in this district have found that similar tort claims premised on a defendant's fraudulent acts did not "occur on navigable water," nor were caused by a vessel on navigable water, where the fraud at issue—although perhaps related to a vessel on navigable water—nonetheless occurred on land.  *See, e.g.*, *Dynamic Worldwide Logistics, Inc. v. Exclusive Expressions, LLC*, No. 14 Civ. 1370 (ER), 2015 WL 5439217, at *10 n.14 (S.D.N.Y. Sept. 14, 2015) (reasoning that, "[a]s alleged in the [proposed Amended Complaint], all of the interactions between Plaintiff and Defendants took place on land.  Therefore, since the relevant conduct did not occur on navigable waters, the Court may not exercise admiralty jurisdiction over Plaintiff's fraud claim"); *W. Bulk Carriers KS v. Centauri Shipping Ltd.*, No. 11 Civ. 5952 (RJS), 2013 WL 1385212, at *4 (S.D.N.Y. Mar. 11, 2013) (holding that "Plaintiff's wrongful attachment claim clearly falls outside the scope of admiralty jurisdiction" because the "allegedly tortious conduct—Defendant's misrepresentation . . .—neither occurred on navigable waters nor was caused by a vessel on such waters" and "therefore fails to satisfy the locality requirement for maritime torts"); *Maersk, Inc. v. Neewra, Inc.*, 687 F. Supp. 2d 300, 341 (S.D.N.Y. 2009), *aff'd sub nom. Maersk, Inc. v. Sahni*, 450 F. App'x 3 (2d Cir. 2011) (explaining that plaintiff's "fraud claims . . . fail to satisfy the situs requirement" because the alleged fraud "did not take place on navigable waters (nor does this case involve an injury suffered on land but caused by a vessel)" where the "[n]umerous misrepresentations allegedly occurred before the . . . cargo left New Jersey and after it arrived in Kuwait, but the only activity that occurred on the high seas was the uneventful transport of twenty

wooden crates"); *Smith v. Mitlof*, 198 F. Supp. 2d 492, 500 (S.D.N.Y. 2002) (concluding that

plaintiffs' claims for fraud and negligent misrepresentation "fail to satisfy the situs requirement

for admiralty tort jurisdiction" because such "alleged torts, arising out of representations made by

[one defendant] in the sale of the [the vessel] to [another defendant], took place on land where the

contract was consummated"); *Maritima Petroleo E Engenharia LTDA v. Ocean Rig 1 AS*, 78 F.

Supp. 2d 162, 171-72 (S.D.N.Y. 1999) (dismissing plaintiff's tort claim for lack of admiralty

jurisdiction where "the tortious act occurred when the MOA was signed," "any misrepresentations

which occurred most certainly occurred on land when the parties executed the MOA," and there

was "no evidence that any element of the alleged fraud was committed anywhere close to navigable

water")[4]; *see also Golden Horn Shipping Co. v. Volans Shipping Co.*, No. 14 Civ. 2168 (JPO)

(JCF), 2015 WL 1344374, at *2-3 (S.D.N.Y. Mar. 23, 2015), *objections overruled,* No. 14-CV-

2168 (JPO), 2015 WL 6684518 (S.D.N.Y. June 30, 2015) (denying plaintiff's motion for leave to

amend its complaint to add a tort claim for intentional interference with contract, concluding that

"amendment would be futile because the tort claim is not an admiralty claim" where "the alleged

tort" consisted of one defendant "induc[ing]" another to charter and sell the vessel, which "did not

occur on navigable water, nor was the claimed injury caused by a vessel on navigable water").

Plaintiff has therefore failed to satisfy its burden of establishing that the alleged torts

occurred on navigable water or that its injury was caused by a vessel on navigable water.

---

[4] Plaintiff contends that the Gourdomichalises "mischaracterize and conflate the test for admiralty contract and tort jurisdiction," and "incorrectly rely upon *Maritima*," which—Plaintiff asserts—is an inapplicable "contract case."  *See* Pl. Opp'n, Dkt. 48, at 5; *see also id.* at 6 (arguing that it has "properly invoke[d] the Court's admiralty tort jurisdiction," and therefore *Maritima*, as "an unrelated case about contract jurisdiction" is "inapplicable").  Plaintiff fails to mention, however, that *Maritima* also involved a tort claim for defendants' alleged fraudulent misrepresentations.  *See Maritima*, 78 F. Supp. 2d at 166, 171-72.

### B. Connection to Maritime Activity

Because Plaintiff has failed to satisfy the location requirement, the inquiry could end there. *See, e.g.*, *Smith*, 198 F. Supp. 2d at 500; *Maritima Petroleo*, 78 F. Supp. 2d at 172.  Even assuming that Plaintiff could meet the location test, however, it nonetheless fails to satisfy the two prongs of the "connection" test.  In analyzing the alleged torts' connection to maritime activity, the Court must first ask "whether the general type of incident involved has a potentially disruptive effect on maritime commerce."  *Germain*, 824 F.3d at 270 (quoting *Tandon*, 752 F.3d at 248).  Second, it must ask "whether the general character of the activity giving rise to the incident bears a substantial relationship to traditional maritime activity."  *Id.*  As the Second Circuit has explained, "[t]he first part of the connection test looks to the nature of the incident that immediately caused the underlying injury; the second part, by contrast, looks to the nature of the broader activity giving rise to that incident."  *Id.* at 270 (quoting *Tandon*, 752 F.3d at 250-51).

### 1. General Type of Incident

Courts define the "general type of incident involved" at an "intermediate level of possible generality," *id.* at 260 (citation omitted), such that it is "neither too general to distinguish different cases nor too specific to the unique facts of the particular case," *Tandon*, 752 F.3d at 247.  The "focus" under this prong "is on capturing possible effects of similar incidents on maritime commerce," and the description should therefore be "general enough" to do so.  *See Germain*, 824 F.3d at 272 (quoting *Tandon*, 752 F.3d at 249).  After defining the general type of incident giving rise to the tort, the court next asks "whether [that] incident could be seen within a class of incidents that posed more than a fanciful risk to commercial shipping."  *Grubart*, 513 U.S. at 539.  This "first part of the connection inquiry does not turn on the *actual* effects on maritime commerce of a particular incident; rather, a court must assess the general features of the type of incident involved

to determine whether such an incident is likely to disrupt commercial activity."  *Germain*, 824
F.3d at 267 (quoting *Sisson*, 497 U.S at 363) (internal quotation marks and alterations omitted);
*see also Tandon*, 752 F.3d at 249 ("[W]e look not to the particular facts of the case before us—
i.e., whether maritime commerce was actually disrupted here—but to whether similar occurrences
are likely to be disruptive.").

As a preliminary matter, the parties dispute how to describe the "general type of incident
involved" in this action.  Defendants' characterization of the "type of incident," on the one hand,
is too specific under the Second Circuit's precedent.  The Gourdomichalises define the "type of
incident" as the "alleged 'conspiracy' to frustrate a subrogated cargo underwriter's effort to
recover a loss."  *See* Gourdomichalis Ltr. at 3; *see also* Tr. at 6.  The American Club similarly
defines the "type of incident" as the "alleged conspiracy to avoid paying a cargo claim of a
subrogated insurance company."  *See* American Club Ltr. at 4; *see also* Tr. at 19.  Such a
description does not define the incident at an "intermediate level of possible generality."  *Germain*,
824 F.3d at 260 (citation omitted).  Plaintiff's description, on the other hand, is inadequate for
another reason.  It simply does not capture the incident underlying the torts actually alleged here.
It appears to argue that the "type of incident" is twofold: (1) the "failure to provide a seaworthy
vessel fit for [] intended service," and (2) the Vessel's "subsequent detention, grounding, and []
ultimate abandonment . . . in navigable waters."  *See* Pl. Ltr. at 4.

Thus, neither party has properly defined the "type of incident" involved in this action.
Based on the allegations in the Complaint, the Court concludes that the "general type of incident"
is best described as an abandonment of a detained vessel on navigable water and the termination

of such vessel's insurance coverage.[5]  The Court cannot conclude, however, that such an incident

has a "potentially disruptive impact on maritime commerce."   Neither the abandonment of a

detained vessel nor the termination of that vessel's insurance coverage would "immediately disrupt

navigation" as such events would not "create any obstruction to the free passage of commercial

ships along navigable waterways."  *See Tandon*, 752 F.3d at 249.  "Nor can [Defendants' alleged

torts] lead to a disruption in the course of the waterway itself," or to "immediate[] damage [to]

nearby commercial vessels."  *See id.*   Even if Defendants' actions could have *some* effect on

maritime commerce—because the Vessel was docked on navigable water at the time of the alleged

abandonment and insurance termination—the Supreme Court has counseled that "[n]ot every

accident in navigable waters that might disrupt maritime commerce will support federal admiralty

jurisdiction."  *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 675 n.5 (1982).[6]  Indeed, the type

---

[5] There is no allegation, for instance, that Defendants abandoned the Vessel while it was out on navigable waters or otherwise recklessly left the abandoned ship on the open sea.  To the contrary, Defendants' abandonment is alleged to have occurred in approximately January 2015, *see* Compl. ¶ 1, about five months after the grounding incident in Brazil.  Indeed, Plaintiff alleges that, in August 2014, the Vessel "broke free of her moorings, drifted to the middle of the channel, [] grounded," *id.* ¶ 69, and was subsequently "refloated," *id.* ¶ 71, and "shifted to the inner anchorage north of the terminal," *id.* ¶ 72, and then to "the outer anchorage," *id.* ¶ 81.  The Vessel then "remained under detention" for the next six months, *see id.* ¶ 82—a time period during which Defendants allegedly conspired to abandon it in Brazil and terminate its insurance, *see, e.g.*, *id.* ¶¶ 1, 92, 99.  The abandonment thus allegedly occurred while the Vessel was "under detention," *see id.* ¶ 82, presumably while it was docked in a nearby "anchorage."

[6] The circumstances of this case are unlike those present in typical admiralty tort jurisdiction cases.  *See, e.g.*, *Sisson*, 497 U.S. at 362 ("This case involves a fire that began on a noncommercial vessel at a marina located on a navigable waterway.  Certainly, such a fire has a potentially disruptive impact on maritime commerce, as it can spread to nearby commercial vessels or make the marina inaccessible to such vessels."); *Foremost*, 457 U.S. at 675 ("The potential disruptive impact of a collision between boats on navigable waters, when coupled with the traditional concern that admiralty law holds for navigation, compels the conclusion that this collision between two pleasure boats on navigable waters has a significant relationship with maritime commerce.").  Nor do the cases cited by Plaintiff lend it much support.  In *Burke v. Quick Lift, Inc.*, 464 F. Supp. 2d 150 (E.D.N.Y. 2006), for instance, the court noted that "the improper installation, and subsequent failure, of a device designed to lift small boats from the water onto a vessel while the vessel is docked in navigable waters, poses more than a fanciful risk of disrupting commercial activity at ports and on waterways."  *See id.* at 156.  In *Parker v. Malletts Bay Boat Club, Inc.*, No. 09-cv-244, 2010 WL 3767295 (D. Vt. Sept. 27, 2010), the court concluded that plaintiff's slip-and-fall while boarding a "large motor boat used to transport passengers" had the "potential to impact maritime commerce" because first, "the accident could have occasioned the response of emergency personnel whose presence and activities, in turn, may have impeded the passage of other vessels and the access of both vessels and passengers to the dock," and second, "the tender itself may have remained stationary for an extended period of time while the passenger was treated," which would have the potential to disrupt commercial traffic.  *See id.* at *1, 4.  *DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d

of abandonment alleged here—of a detained vessel, purportedly done in order to "avoid paying a large uncollectible [] claim and/or a large cargo claim," *see* Compl. ¶ 98—is not the type of abandonment of a vessel that would "pose[] more than a fanciful risk to commercial shipping." *Grubart*, 513. U.S. at 539.

Plaintiff's assertions in its opposition and supplemental letter do little to persuade the Court otherwise.  Plaintiff contends that maritime commerce was "impacted" by Defendants' alleged tortious activity because this lawsuit is based on an incident that "arises as a result of the Vessel interest breaching the contract of carriage, and ultimately Defendants' conspiratorial and tortious conduct to arrange for the abandonment of the ship and self-serving cancellation of the Vessel's P&I insurance."  *See* Pl. Opp'n, Dkt. 48, at 7.  In particular, Plaintiff argues that Defendants' conduct caused "significant damages," which "touch upon maritime commerce," such as the "breach of the charter party agreement between Pacific Gulf and Adamastos Shipping," the "breaches of Pacific Gulf's sub-charter party agreement," the "damage and loss of the Vessel's perishable soyabean cargo," as well as "damages to Plaintiff as the marine insurer ultimately required to cover the losses associated with the cargo damage following Defendants [sic] torts." *See id.* at 7-8.  Whether alleged torts "touch upon maritime commerce," however, is not the relevant standard.  And although Plaintiff argues in its supplemental letter that the detention and grounding incident in Brazil "created obstructions to the passage of commercial ships in and out of the port, halted port operations, delayed the loading/discharge of cargo operations, backed up vessel arrivals/departures, and interfered with the shipboard employment of the crew and their subsequent repatriation," Pl. Ltr. at 4—events that may indeed have a potentially disruptive impact

---

192 (E.D.N.Y. 1999), moreover, is inapposite, as it did not even involve admiralty torts.  Notably, Plaintiff has cited no cases involving similar claims as here—i.e., fraud and conspiracy—in support of these jurisdictional arguments.

on maritime commerce—Defendants are not alleged to have tortiously caused the detention or grounding of the Vessel in Brazil.  To the contrary, Plaintiff has failed to demonstrate how the abandonment of the Vessel, while it was detained in Brazil, or the termination of its insurance coverage could have a potentially disruptive effect on maritime commerce.

### 2.   General Character of Activity

As to the second prong of the connection inquiry, a court must ask "whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand."  *Grubart*, 513 U.S. at 539-40.  To analyze this issue, courts begin by "describ[ing] the 'general character' of the alleged tortfeasor's activity which gave rise to the incident."  *Germain*, 824 F.3d at 274 (citations omitted).  The "substantial relationship test" is "satisfied when at least one alleged tortfeasor was engaging in activity substantially related to traditional maritime activity and such activity is claimed to have been a proximate cause of the incident."  *Grubart*, 513 U.S. at 541.

The Court again finds that the parties have not accurately defined the general character of the activity giving rise to the incident for purposes of the "alleged tort[s]" here.  *See Germain*, 824 F.3d at 270.  Indeed, Defendants appear to describe both the "general features of the type of incident involved"—the first prong—and the "general character of the activity giving rise to the incident"—the second prong—in the very same manner.  *See, e.g.*, American Club Ltr. at 4 (describing the type of incident as the "alleged conspiracy to avoid paying a cargo claim of a subrogated insurance company"); *id.* at 5 (describing the activity giving rise to the incident as "land-based torts based upon an alleged conspiracy to avoid paying a cargo claim of a subrogated insurance company"); Tr. at 6 (Gourdomichalises describing the type of incident as the "alleged

27

conspiracy to frustrate a subrogated cargo underwriter's effort to recover a loss"); *id.* at 10 (Gourdomichalises describing the activity giving rise to the incident as "frustrating the right to subrogate," not "abandoning the Vessel").[7]  Plaintiff, on the other hand, describes the relevant activity as Defendants' "ownership, operation, management, and specialized marine insurance of general cargo dry bulk vessels."  *See* Pl. Ltr. at 5.  But even if Defendants did own, operate, manage, and/or provide insurance coverage for vessels, such activities are not those *giving rise to the incident* here.  Indeed, Plaintiff's formulation seems to ignore the torts it has asserted in this action, all of which are premised on Defendants' alleged conspiracy.  *See Germain*, 824 F.3d at 270 (noting that the inquiry looks at "whether the *alleged tort* meets both subparts of the connection test") (emphasis added).

As such, the Court concludes that the general character of the activity giving rise to the incident here is Defendants' alleged conspiracy—i.e., the agreement to abandon the Vessel and terminate its insurance coverage.  Plaintiff has failed to satisfy its burden of demonstrating that an alleged conspiracy to abandon a vessel—even if on navigable water—or to terminate a vessel's insurance coverage "bears a substantial relationship to traditional maritime activity."  *Germain*, 824 F.3d at 270 (citation omitted).  The Court is not persuaded, for instance, by Plaintiff's contentions that Defendants' conduct is "related to traditional maritime activity" merely because Defendants "were aware of the incident in Brazil," "claim files were opened for both FD&D and P&I insurance claims," or the "wrongful decision to abandon the Vessel[] was made by Defendants while the Vessel was on navigable waters, engaged in traditional maritime activity, and subject to both the charter party governing the voyage and marine insurance contracts" that covered the

---

[7] In their supplemental letter, however, the Gourdomichalises defined the activity giving rise to the incident as "Plaintiff's alleged inability to recover for the amount paid to resolve Marubeni's claim."  Gourdomichalis Ltr. at 5. If anything, such a description reflects the *effects* of the underlying incident, not the "activity giving rise to the incident" itself.

Vessel.  *See* Pl. Opp'n, Dkt. 48, at 8.[8]  Importantly, Plaintiff fails to allege how its claims regarding Defendants' purported conspiracy relate to "traditional maritime activity."  *See, e.g.*, *Pires v. Heller*, No. 04 Civ. 9069 (RJH), 2004 WL 2711075, at *2 (S.D.N.Y. Nov. 24, 2004) (defendant's "alleged tortious conduct in stealing money from his client and co-counsel, as well as any tortious conduct allegedly committed by [a third-party], is entirely separate from the underlying maritime action in which [plaintiff] suffered leg amputations from his shipowner's denial of maintenance and cure").  "Simply labeling [its] claims as 'maritime' does not make them so."  *Id.* at *3.

For all of these reasons, the Court concludes that it does not have admiralty jurisdiction over Plaintiff's five tort claims.  Accordingly, this action must be dismissed for lack of subject matter jurisdiction.[9]

---

[8] In its supplemental letter, Plaintiff does not clearly argue that Defendants' actions even had a *substantial relationship* to traditional maritime activity.  Instead, Plaintiff asserts that Defendants' conduct "related to and caused" the abandonment of the Vessel and the termination of its insurance coverage, "all while the Defendants were carrying out their traditional maritime activity."  *See* Pl. Ltr. at 5.

[9] Because the Court dismisses this action on subject matter jurisdiction grounds, it need not address Defendants' other bases for dismissal.  *See, e.g.*, *Kolenovic v. U.S. Citizenship & Immigration Serv.*, 9 F. Supp. 3d 322, 324 (S.D.N.Y. 2014); *Arnold v. Goetz*, 245 F. Supp. 2d 527, 531 (S.D.N.Y. 2003).

## CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss are granted and this action is dismissed for lack of subject matter jurisdiction.   Because any proposed amendment would be futile in light of the deficiencies identified in this Opinion, the Court denies Plaintiff's request for leave to amend the Complaint.   The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 19 and 31, and close this case.

SO ORDERED.

Dated:     August 6, 2020
           New York, New York

Ronnie Abrams
United States District Judge